UNITED STATES of America,
Plaintiff–Appellee,

v.

Michael Lynn WYNCOOP,
Defendant–Appellant.

No. 92–30444.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Sept. 2, 1993.

Decided Dec. 1, 1993.

Nancy Bergeson, Asst. Federal Public Defender, Eugene, OR, for defendant-appellant.

Neil J. Evans, Asst. U.S. Atty., Portland, OR, for plaintiff-appellee.

Before: BROWNING, SCHROEDER, and HALL, Circuit Judges.

SCHROEDER, Circuit Judge:

The appellant, David Wyncoop, embezzled approximately $65,000 from Trend College, a private technical school where he was employed. Based on this conduct, he was indicted on one count of theft of federal funds in violation of 18 U.S.C. § 666. After the district court refused to dismiss the indictment, appellant entered a conditional guilty plea, reserving the right to appeal the denial of his motion to dismiss. The question reserved for us to decide is whether the federal statute, 18 U.S.C. § 666, applies to Wyncoop's crime.

I

Trend College in Portland, Oregon, employed the defendant, Michael Wyncoop, from October 25, 1990 through July 2, 1991. During the relevant period of his employment, he worked in Student Accounting where he was authorized to write checks on Trend College's student body fund account. Wyncoop was also responsible for depositing student loan checks and vouchers into the College's main fund account. In February 1991, Wyncoop began diverting student loan deposits into the student body fund account and embezzling money from the College by writing checks to his girlfriend on that account.

Defendant was indicted under 18 U.S.C. § 666, which criminalizes embezzlement or theft from an organization or program that receives in excess of $10,000 in federal benefits annually. Wyncoop moved to dismiss the indictment on the ground that the district court lacked jurisdiction because Trend College is not an organization that "receives benefits" in excess of $10,000 each year, as required by the statute.

Trend College receives no federal funds. The issue of federal jurisdiction arises, however, because of Trend College's participation in federal student loan programs. Under both the Guaranteed Student Loan ("GSL") and Supplemental Loans to Students ("SLS") programs set forth in 20 U.S.C. §§ 1071–1099, private banks loan money to qualified students for educational purposes, and the federal government guarantees the loans. Thus, if a student borrower defaults on a loan obligation, the government will repay the bank. In order for its students to be eligible to receive these federally guaranteed loans, a school must agree to abide by a number of conditions, including a requirement that the school monitor the continued enrollment and eligibility of the loan recipients. For this reason banks often issue

the loan checks jointly to the student and to the school.

Under these loan programs, thousands of students who otherwise would not be able to afford to attend college are able to attend. The direct financial beneficiaries of the guarantee programs are the students who receive the loans and the banks whose loans are federally guaranteed. There is no question, however, that the participating educational institutions benefit indirectly from the added pool of students who otherwise would not be able to afford the education. The government argues that through its participation in these programs, Trend College indirectly receives benefits far in excess of $10,000 annually. The parties agree that nearly every institution of higher education in the country participates in these programs.

The district court agreed with the government, holding that as a result of its participation in the GSL and SLS programs, Trend College "receives benefits" sufficient to confer federal jurisdiction over thefts from the College under 18 U.S.C. § 666, 789 F.Supp. 345. After being convicted pursuant to his conditional plea agreement, defendant appeals. We now reverse.

## II

■ We deal here with the issue of the scope of criminal jurisdiction conferred under 18 U.S.C. § 666. That statute applies to employees of any entity receiving federal financial assistance in the requisite amount who steal, embezzle, or obtain money or property by fraud from that entity. The specific question before us is whether the statute applies to employees of entities receiving only indirect benefits from a federal program. After a review of the statute itself, its history, and its interpretation in this and other federal courts, we conclude that Congress' intent was to bring conduct that could have an effect on the administration or integrity of federal funds within the ambit of federal criminal law. Congress did not intend, however, to make misappropriations of money from every organization that receives *indirect* benefits from a federal program a federal crime.

The language of 18 U.S.C. § 666 is important. The statute in relevant part provides:

(a) Whoever, if the circumstance described in subsection (b) of this section exists—

(1) being an agent of an organization, or of a State, local, or Indian tribal government, or any agency thereof—

(A) embezzles, steals, obtains by fraud, or otherwise without authority knowingly converts to the use of any person other than the rightful owner or intentionally misapplies, property that—

(i) is valued at $5,000 or more, and

(ii) is owned by, or is under the care, custody, or control of such organization, government, or agency; ...

.     .     .     .     .

shall be fined under this title, imprisoned not more than 10 years, or both.

(b) The circumstance referred to in subsection (a) of this section is that the organization, government, or agency receives, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance.

(c) This section does not apply to bona fide salary, wages, fees, or other compensation paid, or expenses paid or reimbursed, in the usual course of business.

In subsection (b), Congress limited the statute's scope to instances where the injured entity "receive[s] benefits" of $10,000 annually under a federal program "involving" a grant, contract, subsidy, loan, guarantee, insurance, or other form of federal assistance. In this case, there is no question that the federal student loan programs "involve" both guarantees from the government to private banks and loans from banks to students. There is also no question that the guarantee programs directly benefit both the students and the banks, and that Trend College receives indirect benefits in the form of tuition payments that may otherwise not be made. The statute clearly does not reach all entities that benefit from federal programs or expenditures, however. Congress expressly exempted organizations that receive certain

types of commercial payments from the government. 18 U.S.C. § 666(c); *see United States v. Rooney*, 986 F.2d 31, 34 (2d Cir. 1993); *United States v. Stewart*, 727 F.Supp. 1068, 1072 (N.D.Tex.1989). The critical issue is whether Congress intended its net to sweep so far as to cover employees of all organizations receiving indirect benefits from federal programs.

The legislative history is helpful in answering this question. That history shows that in enacting section 666, Congress was trying to protect the integrity of federal funds. Specifically, Congress was attempting to fill two gaps that had been revealed in existing legislation. First, under 18 U.S.C. § 641, which proscribed the theft of property "belonging to the United States," theft of money distributed under federal programs could not be prosecuted if title to the funds had either passed to another entity or had become so commingled with other assets that the "federal character" of the funds could not be shown. *See* S.Rep. No. 98–225, 98th Cong., 2d Sess. (1984), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3510–11. Second, the existing federal bribery statute, 18 U.S.C. § 201, was inadequate to ensure the integrity of federal programs because individuals administering the funds but employed by other entities had been found not to be "[f]ederal officials" as required under that statute. The Senate Report specifically states that the new statute, section 666, was intended to fill these gaps and "protect the integrity of the vast sums of money distributed through federal programs from theft, fraud, and undue influence by bribery." *Id.* at 3511. The emphasis was on protecting federal funds. The report lists three specific cases to which section 666 was intended to apply. In each of these cases, there was an issue as to whether an individual administering federal funds was a "federal official" who could be prosecuted under section 201.[1] There is no indication in the history of section 666 that Congress intended federal law enforcement agencies to police the financial affairs of private entities that do not administer federal

funds. The legislative history therefore supports the defendant's contention that the statute was not intended to cover thefts from institutions like Trend College that do not themselves receive and administer federal funds.

The leading case in this circuit interpreting section 666 is *United States v. Simas*, 937 F.2d 459 (9th Cir.1991), where we held, fully in keeping with the statute's legislative history, that in order to obtain jurisdiction of a defendant under section 666, the government need not prove that the funds actually stolen by the defendant were of federal origin. So long as the defendant is an agent of an organization that receives more than $10,000 in federal benefits in any given year, it is not necessary that the particular funds stolen be among those "benefits." *See also United States v. Coyne*, 4 F.3d 100 (2d Cir.1993) (establishing the same rule in the Second Circuit). In *Simas* we quoted with approval the opinion of the Fifth Circuit in *United States v. Westmoreland*, 841 F.2d 572, 576 (5th Cir.), *cert. denied*, 488 U.S. 820, 109 S.Ct. 62, 102 L.Ed.2d 39 (1988), which had said: "[A]ny reference to federal funds is conspicuously absent from the operative provisions, and it is clear that Congress has cast a broad net to encompass local officials who may administer federal funds, regardless of whether they actually do." *Id.* at 577.

■ We stressed in *Simas* that when Congress enacted section 666, it intended to "protect federal funds by preserving the integrity of the entities that receive the federal funds rather than requiring the tracing of federal funds to a particular illegal transaction." 937 F.2d at 463. In this case, however, the defendant was employed by an entity that *never received any federal funds* under the loan programs. Trend College itself received only the indirect benefits associated with increased enrollment of students receiving private loans induced by federal guarantees to the private lenders. Thus, applying section 666 to defendant's misdeeds would

---

1. The cases mentioned were *United States v. Del Toro*, 513 F.2d 656 (2d Cir.), *cert. denied*, 423 U.S. 826, 96 S.Ct. 41, 46 L.Ed.2d 42 (1975); *United States v. Hinton*, 683 F.2d 195 (7th Cir.),

*aff'd sub nom., Dixon v. United States*, 465 U.S. 482, 104 S.Ct. 1172, 79 L.Ed.2d 458 (1982); and *United States v. Mosley*, 659 F.2d 812 (7th Cir. 1981). 1984 U.S.C.C.A.N. at 3511.

not further the recognized purpose of section 666.

The purpose and the language of section 666 are very different from the statute being construed in *Grove City College v. Bell*, 465 U.S. 555, 104 S.Ct. 1211, 79 L.Ed.2d 516 (1984), on which the district court heavily relied. There, the Court dealt not with a criminal statute, but with civil statutes and regulations designed to eliminate sex discrimination in institutions of higher learning. The statute in question, section 901(a) of Title IX of the Education Amendments of 1972, prohibited sex discrimination in "any education program or activity receiving federal financial assistance." 20 U.S.C. § 1681(a). The statute further directed agencies distributing federal assistance to promulgate regulations to ensure that recipients of federal benefits adhere to Title IX's prohibition against discrimination. 20 U.S.C. § 1682. The regulations accordingly adopted by the Department of Education specifically defined financial assistance to include:

> (ii) Scholarships, loans, grants, wages or other funds extended to any entity for payment to or on behalf of students admitted to that entity, or extended directly to such students for payment to that entity.

34 C.F.R. § 106.2(g)(1)(1983). The regulations went on to define a recipient to include:

> [A]ny public or private agency, institution, or organization, or other entity, or any person, to whom Federal financial assistance is extended *directly or through another recipient* and which operates an education program or activity which *receives or benefits* from such assistance.

34 C.F.R. § 106.2(h) (1983) (emphasis added).

Applying that statute and the regulations, the Supreme Court concluded that a college that benefitted indirectly from a federal student assistance program was bound to comply with Title IX. A contrary ruling would have thwarted the Congressional purpose of Title IX to eliminate sex discrimination in the administration of colleges and universities who benefit, directly or indirectly, from federal financial assistance programs.

The statute in this case, in contrast, is not intended to do anything except protect the integrity of federal funds. Where, as here, the institution receives no such funds, the statute need not and does not make stealing from that institution a federal crime.

■ The government emphasizes that colleges and universities that participate in the student loan programs agree to abide by certain conditions. These conditions are designed principally to ensure that the students receiving federally guaranteed loans are in fact using the funds for educational purposes, and will be able to repay their loans when they come due. The colleges' acceptance of these conditions does not render them recipients of benefits within the meaning of section 666. Colleges and universities sign on to these agreements because they do benefit indirectly from the loan program. The indirect benefit is in some way similar to the benefit received by grocery stores that take food stamps, and, not surprisingly, such stores are required to make contractual commitments in order to participate in the food stamp program as well. 7 C.F.R. § 278. Yet there is no more reason to conclude that Congress in enacting section 666 intended to bring employees at every college and university in the country within the scope of potential federal criminal jurisdiction than it is to assume that Congress wished to reach employees of every grocery store.

For all of these reasons we conclude that the expansive interpretation of section 666 advocated by the government in this case is not consistent with the Congressional purposes in enacting the statute. The judgment of conviction of the district court is reversed and the matter remanded with instructions to dismiss the indictment.

**REVERSED AND REMANDED.**