UNITED STATES of America,

v.

John DRANSFIELD and Robert Tucker, Defendants.

No. 93 Cr 0567 (SJ).

United States District Court, E.D. New York.

Jan. 3, 1996.

---

Zachary W. Carter, United States Attorney, Eastern District of New York, by Joel M. Cohen, Assistant U.S. Attorney, Brooklyn, NY, for U.S.

Bythewood and Associates by David Bythewood, Garden City, NY, for Defendant Dransfield.

Murray & McCain by Francis J. Murray, Rockville Centre, NY, for Defendant Tucker.

## MEMORANDUM AND ORDER

JOHNSON, District Judge:

Before the Court are Defendant Robert Tucker's motion to dismiss the indictment pursuant to Rule 7(c) of the Federal Rules of Criminal Procedure, and Defendants Robert Tucker and John Dransfield's motions to dismiss the indictment for lack of subject matter jurisdiction pursuant to Fed.R.Crim.P. 12(b). For the reasons set forth below, Defendants' motions are denied.

## BACKGROUND

On April 20, 1993, government agents executed arrest warrants against fourteen individuals for their alleged participation in bribery and bid rigging schemes at the New York City School Construction Authority ("SCA"). Two of the arrested individuals were Defendants Robert Tucker and John Dransfield. The complaint underlying the arrest warrants charged Tucker and Dransfield with violations of 18 U.S.C. § 1956 (money laundering), § 666 (bribery of a public official),[1] and § 1341 (mail fraud). On May 20, 1993, the grand jury indicted defendants Tucker and Dransfield, together with another individual named Mike Batalias.

On January 21, 1994, pursuant to a plea agreement with the government, Defendant Dransfield pled guilty to a Superseding Information which included one count of receiving bribes in violation of § 666(a)(2) and one count of structuring currency transactions in violation of 31 U.S.C. § 5324. On February 22, 1994, the grand jury returned two Superseding Indictments. One of the Superseding Indictments (S–3) (the "Superseding Indictment") charged Defendant Tucker and another individual, Evangelos Gatzonis, of engaging in a scheme to pay bribes to two SCA employees in violation of § 666(a)(2).[2]

On March 31, 1994, Evangelos Gatzonis filed a motion to dismiss the Superseding Indictment for failure to comply with Fed. R.Crim.P. 7(c) and for lack of subject matter jurisdiction or, in the alternative, to dismiss the Superseding Indictment with prejudice for failure to comply with the Speedy Trial Act, 18 U.S.C. §§ 3161 *et seq.* Defendant Tucker joined in Gatzonis's motion to dismiss the Superseding Indictment for failure to comply with Rule 7(c) and for lack of subject matter jurisdiction on April 7, 1994.[3] Although he had already pled guilty, Defendant Dransfield subsequently informed the Court that he might seek permission to withdraw his plea following the Court's decision on the

---

1. Defendant Dransfield is charged with accepting bribes in connection with his work as an SCA senior project officer. Defendant Tucker is charged with paying bribes to an SCA agent in order to obtain certain benefits for his contracting company.

2. The other superseding indictment charged Mike Batalias with a similar § 666(a)(2) viola-

tion. Batalias pled guilty to the superseding indictment on September 14, 1994 pursuant to a plea agreement with the government.

3. Defendant Tucker did not join in the motion asserting a Speedy Trial Act violation since he was indicted within thirty days after he was arrested.

present motions.[4] Dransfield then joined in Gatzonis and Tucker's jurisdiction motion on April 29, 1994.

The Court heard argument on the jurisdiction and Speedy Trial motions on September 21, 1995. As to Evangelos Gatzonis, the Court dismissed the Superseding Indictment without prejudice based on the government's admitted failure to indict Gatzonis within the permissible period of time set forth in the Speedy Trial Act. In regard to the jurisdiction motion, the Court reserved judgment and invited Defendants Tucker and Dransfield to supplement their previously filed memoranda. As part of this additional briefing, the government provided a proffer of facts in support of subject matter jurisdiction. Specifically, the government provided copies of four Grant Agreements which memorialize agreements between the Federal Aviation Administration ("FAA"), a federal government agency, and the Port Authority of New York & New Jersey (the "Port Authority"). The Grant Agreements are dated June 12, 1991 (as to two grants), August 4, 1992, and August 24, 1992. The government contends that these grants provide the jurisdictional basis for charging the Defendants under § 666.

## DISCUSSION

In support of his motion to dismiss the Superseding Indictment, Defendant Tucker sets forth two separate grounds for dismissal. Defendant Dransfield joins in only one of these motions.

First, Defendant Tucker contends that the Superseding Indictment should be dismissed because it fails to comply with Rule 7(c) of the Federal Rules of Criminal Procedure. He claims that the Superseding Indictment is deficient because it fails to allege that the SCA directly receives the requisite federal funding required by 18 U.S.C. § 666(b).

Second, Defendants Tucker and Dransfield argue that, even if the Superseding Indictment could be read to state a federal offense, it should be dismissed for lack of subject matter jurisdiction because the SCA does not

in fact receive benefits under a Federal program. Specifically, the Defendants assert that the government's proffer does not provide a basis for the "$10,000 in federal funding element" required by 18 U.S.C. § 666.

I. *Sufficiency of the Superseding Indictment Under Rule 7(c)*

Title 18, U.S.C. § 666 provides in pertinent part:

(a) Whoever, if the circumstances described in subsection (b) of this section exists—

(1) being an agent of an organization, or of a State, local, or Indian tribal government, or any agency thereof—

(A) . . .

(B) corruptly solicits or demands for the benefit of any person, or accepts or agrees to accept, anything of value from any person, intending to be influenced or rewarded in connection with any business, transaction, or series of transactions of such organization, government, or agency involving anything of value of $5000 or more; or

(2) corruptly gives, offers, or agrees to give anything of value to any person, with intent to influence or reward an agent of an organization or of a State, local or Indian tribal government, or any agency thereof, in connection with any business transactions of such organization, government or agency involving anything of value of $5000 or more;

shall be fined under this title, imprisoned not more than 10 years, or both.

(b) The circumstance referred to in subsection (a) of this section is that the organization, government, or agency receives, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of federal assistance.

18 U.S.C. § 666.

Paragraph One of the Superseding Indictment alleges that "[t]he SCA's funding in-

---

4. Defendant Dransfield claims that at the time of his plea he was not aware of the jurisdiction issue. It is well-settled that a plea of guilty

waives all challenges to the prosecution *except* jurisdictional defects. *E.g., United States v. Weinberg,* 852 F.2d 681, 684 (2d Cir.1988).

cluded forms of federal assistance in excess of $10,000 per year." Paragraph Eight alleges that the SCA was an "agency of state and local government that received in excess of $10,000 of federal assistance in a one-year period." Defendant Tucker contends that the Superseding Indictment is fatally defective on its face because it fails to allege that the SCA receives benefits "under a Federal program," as required under § 666. Defendant Tucker argues that the Superseding Indictment is additionally deficient because, at most, it can be read to allege that the SCA is an indirect beneficiary of funding from state and local government which received, in turn, benefits from the federal government.

■ An indictment is sufficient under Rule 7(c) when it informs the defendant of the charges he must meet "with sufficient precision" in order to prepare a defense and "with enough detail that he may plead double jeopardy in a future prosecution based on the same set of events." *United States v. Stavroulakis,* 952 F.2d 686, 693 (2d Cir.), *cert. denied,* 504 U.S. 926, 112 S.Ct. 1982, 118 L.Ed.2d 580 (1992); *see also United States v. Panza,* 750 F.2d 1141, 1148 (2d Cir.1984). The Second Circuit has stated that " 'an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime.' " *Stavroulakis,* 952 F.2d at 693 (quoting *United States v. Tramunti,* 513 F.2d 1087, 1113 (2d Cir.), *cert. denied,* 423 U.S. 832, 96 S.Ct. 54, 55, 46 L.Ed.2d 50 (1975)). Furthermore, succinct criminal pleading is encouraged under Rule 7(c). Where the allegations are brief, an indictment must be read with "common sense" and

to include facts which are implied by the allegations made. *Id.* at 693.

■ In the present case, a reading of the Superseding Indictment in its entirety and with a modicum of common sense cannot leave Defendant Tucker with any doubt as to the time, place and offense with which he is being charged. The Superseding Indictment alleges that Tucker gave, offered and agreed to offer things of value to two SCA employees intending to influence and reward them in connection with SCA-related business. The Superseding Indictment defines the approximate time period involved—August 1991 through April 20, 1993—and names the two SCA employees with whom Tucker allegedly had corrupt relationships. Finally, although it does not use the specific words "under a Federal program" that appear in § 666(b), the Superseding Indictment alleges that the SCA received federal funding in excess of $10,000 per year.

The Court finds that these allegations are sufficient to satisfy the requirements of Rule 7(c), which requires merely "a plain, concise, and definite written statement of the essential facts constituting the offense charged." [5] Accordingly, Defendant Tucker's motion to dismiss the Superseding Indictment pursuant to Rule 7(c) is denied.

## II. Court's Authority to Make a Pretrial Determination As to Jurisdiction

Having denied Defendant Tucker's motion to dismiss pursuant to Rule 7(c), the Court now considers, as a threshold matter, whether it has authority under Fed.R.Crim.P. 12(b) to make a pretrial factual determination as to subject matter jurisdiction in the present case.[6] Rule 12(b) provides for pretrial motions which raise "[a]ny defense, objection, or

---

5. In regard to Defendant Tucker's argument that the Superseding Indictment is deficient because § 666 does not reach indirect beneficiaries of federal funds, the Court finds that this is not a pleading issue but rather goes to the question of jurisdiction. The Court will therefore address this argument in the section of this opinion dealing with subject matter jurisdiction and the funding of the SCA.

6. When Defendants first filed the instant motion, they claimed to have evidence that the SCA did not receive federal funding sufficient to satisfy § 666. In support of this claim, they provided affidavits and exhibits attesting to their investiga-

tion of the SCA's sources of funding which determined that the SCA does not receive any federal funding. The Defendants asserted that, if the Court was not inclined to dismiss the Superseding Indictment based on the record, they were entitled to a pretrial hearing under Rules 12(b) and 12(e) to determine the SCA's source of funding. The government strongly disputed the Defendants' factual assertions, and claimed that Defendants' contention amounted to an argument that there is insufficient evidence of federal funding to sustain a conviction. The government also argued that the Court lacked the authority to make a pretrial factual determination as to the jurisdiction element of § 666.

request which is capable of determination without the trial of the general issue." "Questions about subject matter jurisdiction may be raised under Rule 12(b), but also may be raised at any time during the pendency of the proceedings." *United States v. Ayarza–Garcia,* 819 F.2d 1043, 1048 (11th Cir.) (citing Fed.R.Crim.P. 12(b)(2)), *cert. denied,* 484 U.S. 969, 108 S.Ct. 465, 98 L.Ed.2d 404 (1987).

■ The government argues that whether it will be able to introduce sufficient evidence from which a jury can conclude that the SCA received the requisite type and amount of funding is not an issue that can be determined on a Rule 12(b) motion. Indeed, Courts have held that "a pretrial motion to dismiss the indictment cannot be based on a sufficiency of the evidence argument because such an argument raises factual questions embraced in the general issue." *Id.* (citing cases).

■ In the present case, the Court finds that Defendants' argument regarding the SCA's source of funding does not raise factual questions embraced in the general issue. "The 'general issue' has been defined as evidence relevant to the question of guilt or innocence." *Id.* (citing *United States v. Barletta,* 644 F.2d 50, 58 (1st Cir.1981)). Whether the SCA received federal assistance in excess of $10,000 in a one-year period goes to whether § 666 applies to the Defendants' alleged criminal conduct, not to the issue of the Defendants' guilt or innocence. *See United States v. Mennuti,* 639 F.2d 107, 113 (2d Cir.1981) (affirming pre-trial dismissal of an indictment for lack of subject matter jurisdiction). Therefore, the Court finds that it may properly decide the jurisdiction question on Defendants' pre-trial motion to dismiss pursuant to Rule 12(b).

III. *Federal Jurisdiction Under 18 U.S.C. § 666*

A. Government Agency

■ In order to determine whether this Court has the requisite jurisdiction in this

case under 18 U.S.C. § 666, the Court must first consider whether the SCA is a "government agency" as that term is defined in § 666. Section 666 defines a "government agency" as

> a subdivision of the executive, legislative, judicial, or other branch of government, including a department, independent establishment, commission, administration, authority, board, and bureau, and a corporation or other legal entity established, and subject to control, by a government or governments for the execution of a governmental or intergovernmental program.

18 U.S.C. § 666(d)(2).

The SCA was created by the New York State legislature in 1988 as a "public benefit corporation." New York Public Authorities Law (PAL) § 1727(1). Hence, the SCA is a "corporation" that was "established" by a government, as required under § 666(d)(2). In addition, New York Public Authorities Law § 1727(2) mandates that the SCA shall "be governed by and its powers shall be exercised by a board of trustees consisting of three members ... one to be appointed by the governor and one to be appointed by the mayor [of New York City]." SCA trustees are considered public servants and SCA employees are considered officers and employees of the City of New York for purposes of the City's financial disclosure requirements. PAL § 1727(4). The Court thus finds that the SCA is "subject to control" by a government, another requirement under § 666(d)(2). Finally, it is plainly evident that the SCA "executes" a "governmental" program as required by § 666(d)(2) in that the SCA was specifically created by the New York State legislature to repair and replace deteriorating New York City school facilities. *See* PAL § 1725 (setting forth legislative findings and describing the SCA's mission).

Accordingly, the Court finds that the SCA constitutes a "government agency" as defined in 18 U.S.C. § 666.

---

Subsequently, on October 18, 1995, the government offered a written proffer of the basis upon which it would be able to demonstrate at trial the SCA's receipt of in excess of $10,000 in benefits under a federal program, within twelve months of the commission of the § 666 offenses alleged against Defendants Tucker and Dransfield. The government still contends, however, that the Defendants' argument cannot properly be made in a pretrial motion.

**B. $10,000 Federal Funding Requirement**

Defendants contend that the four Grant Agreements which the government relies upon for jurisdiction do not satisfy the "$10,-000 in federal funding" element required by 18 U.S.C. § 666. Specifically, Defendants argue that § 666 is not applicable to them because the Port Authority, and not the SCA, is the direct recipient and beneficiary of federal funds under the Grant Agreements. Additionally, Defendant Dransfield claims that the funds received by the SCA are exempt under the statute.

The four Grant Agreements proffered by the government set forth the terms under which the Port Authority applied for and was granted federal funds for noise abatement projects at two New York City Public Schools, P.S. 42 and P.S. 52, which are located in the vicinity of J.F. Kennedy International Airport and LaGuardia Airport respectively. Pursuant to these grants, the Port Authority entered into two contracts on July 31, 1991 with the Board of Education of the City School District of the City of New York (the "Board of Education") and the SCA denominated "Contract to Reduce Aircraft Noise at Public School 52, Bronx, New York" and "Contract to Reduce Aircraft Noise at Public School 42, Arverne, Queens, New York" (collectively, the "SCA Contracts").

> The SCA Contracts[7] provide, in part, that
>
> In order to expedite the implementation of the [noise abatement] Project, the SCA agrees to procure the services of an Architectural/Engineering Consultant to design the work. The Consultant, all changes to SCA's agreement with the Consultant, and all orders to the consultant for additional services and payment thereto, shall require the prior approval of the Port Authority and the FAA.

SCA Contracts ¶ 1. In addition, the SCA Contracts require that the following clause be included in all contracts for consultative services on the noise abatement project:

> The Work to be performed pursuant to this Agreement shall be paid for in part

with Federal Aviation Administration ("FAA") funds from an Airport Improvement Program ("AIP") grant and is subject to the United States Department of Transportation regulations on Disadvantaged Business Enterprises ("DBEs") contained in Part 23 of Title 49 of the Code of Federal Regulations.

SCA Contracts ¶ 4.

Based on the SCA Contracts, Defendants assert that the SCA serves merely as a conduit of federal funds from the Port Authority to the consultants performing the necessary construction work on the noise abatement project. Defendants therefore argue that § 666 jurisdiction is lacking because the SCA did not receive the federal funds provided to effect noise abatement at Public Schools 42 and 52 *directly* from the FAA. They claim that under the statute itself and the controlling case law, the indirect receipt of federal benefits cannot support a prosecution under § 666.

■ In evaluating the scope of a federal criminal statute, the Court "must look closely at its language, legislative history, and purpose." *United States v. Rooney*, 986 F.2d 31, 33 (2d Cir.1993) (citing *Dowling v. United States*, 473 U.S. 207, 213, 105 S.Ct. 3127, 3131, 87 L.Ed.2d 152 (1985)). The Supreme Court has directed, however, that "[c]ourts ... applying criminal laws generally must follow the plain and unambiguous meaning of the statutory language. '[O]nly the most extraordinary showing of contrary intentions' in the legislative history will justify a departure from that language." *United States v. Coyne*, 4 F.3d 100, 108 (2d Cir.1993) (citing *United States v. Albertini*, 472 U.S. 675, 680, 105 S.Ct. 2897, 2902, 86 L.Ed.2d 536 (1985)), *cert. denied*, —— U.S. ——, 114 S.Ct. 929, 127 L.Ed.2d 221 (1994).

*1. Statutory Language*

■ The statutory language does not support the Defendants' interpretation. To fall within § 666(b), an agency must "receive[ ], in any one year period, benefits in excess of

---

**7.** The language in both contracts is identical, with the exception of references to the particular

school to which each contract is addressed.

$10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance." 18 U.S.C. § 666(b). The statute does not explicitly state that an agency must *directly* receive $10,000 in benefits under a Federal program. Furthermore, it cannot reasonably be inferred from the language of the statute that the federal funding element is restricted to funds which are *directly* received by the agency under a Federal program.

### 2. *Legislative History and Purpose*

Defendants refer to several portions of legislative history that they claim reflect a congressional intent to limit the federal funding element of § 666 to agencies which directly receive funds under a Federal program. This Court finds, however, that Defendants' interpretation is inconsistent with the legislative history of § 666.

In *United States v. Wyncoop*, 11 F.3d 119, 122 (9th Cir.1993), the Ninth Circuit concluded, based upon a review of the statute's legislative history, that

> in enacting Section 666, Congress was trying to protect the integrity of federal funds. Specifically, Congress was attempting to fill two gaps that had been revealed in existing legislation. First, under 18 U.S.C. § 641, which proscribed the theft of property "belonging to the United States," theft of money distributed under federal programs could not be prosecuted if title to the funds had either passed to another entity or had become so commingled with other assets that the "federal character" of the funds could not be shown. *See* S.Rep. No. 98–225, 98th Cong., 2d Sess. (1984), reprinted in 1984 U.S.C.C.A.N. 3182, 3510–11. Second, the existing federal bribery statute, 18 U.S.C. § 201, was inadequate to ensure the integrity of federal programs because individuals administering the funds but employed by other entities had not been found to be "[f]ederal officials" as required under that statute.

In regard to the federal funding element of § 666, Congress expressly intended

> that the term "Federal Program involving a grant, a contract, a subsidy, a loan, a guarantee, or another form of Federal Assistance" be broadly construed, consistent with the purpose of this section to protect the integrity of the vast sums of money distributed through Federal programs from theft, fraud, and undue influence by bribery.

S.Rep. No. 225, 98th Cong., 1st Sess. 370 (1983). The Senate Report states, however, that "the concept is not unlimited," and specifies that

> [t]he term "Federal program" means that there must exist a specific statutory scheme authorizing the Federal assistance in order to promote or achieve certain policy objectives.

*Id.*

Defendants contend that, in the present case, the "specific statutory scheme authorizing Federal assistance" is a Noise Compatibility Project involving the soundproofing of Public Schools 42 and 52. Thus, they argue that § 666 is not applicable to them because the Port Authority, and not the SCA, is the agency to which federal assistance is authorized.

The government, in opposition, argues that if Defendants' reasoning were valid, Congress' presently favored form of funding to state and local entities—the block grant—would fall outside the bounds of § 666 jurisdiction. Typically, block grants are grants provided by Congress to the States which, in turn, set general limitations on the methods and purposes for applying the funds. The recipient-State receives the federal funds directly, and then transfers the funds to local entities to be administered. The government asserts that, according to the Defendants' reasoning, only the States that literally received the federal block grant funds from Congress would be protected by § 666. The government further claims that based on the Defendants' interpretation, § 666 would not extend to cover bribery or theft from local entities which receive federal block grant funds.

The Court finds the government's block grant illustration compelling in light of the statute's purpose to protect the integrity of

federal funds, and Congress's intent that the term "Federal program" be broadly construed. This Court does not believe that Congress intended to restrict § 666 only to organizations which receive federal funds directly. The legislative history indicates that it is the receipt of federal funds, rather than the direct receipt of such funds from their original source, that is relevant for purposes of § 666.

### 3. § 666 Caselaw

▉ Defendants claim that their interpretation of § 666 is supported by caselaw analyzing the statute.

Defendants rely, in large part, on the Ninth Circuit's decision in *United States v. Wyncoop.* In that case, the Ninth Circuit reversed the defendant's conviction under 18 U.S.C. § 666 for lack of subject matter jurisdiction. Wyncoop was an employee in the student accounting office of Trend College, a private school which received no federal funds. He was indicted under § 666 for embezzling funds by diverting student loan checks which he was responsible for depositing. *Wyncoop,* 11 F.3d at 120.

Trend College participated in federal student loan programs under which private banks loaned money to select Trend College students for educational purposes. The loans were guaranteed by the federal government. On appeal, the government conceded that Trend College did not "directly" receive federal funds. The government argued, however, that Trend College "receive[d], in any one period, benefits in excess of $10,000 under a Federal program," because it "indirectly" received the proceeds of the government-guaranteed bank loans, which allowed some of its students to afford to pay tuition at the college. *Id.* at 121.

The Ninth Circuit stated that "[t]he critical issue is whether Congress intended its net to sweep so far as to cover employees of all organizations receiving indirect benefits from federal programs." *Id.* at 122. Upon reviewing the legislative history of § 666, the court found "no indication ... that Congress intended federal law enforcement agencies to police the financial affairs of private entities that do not administer federal funds." *Id.*

Accordingly, the court concluded that "[§ 666] was not intended to cover thefts from institutions like Trend College that do not themselves receive and administer federal funds." *Id.*

The facts present in the instant case are readily distinguishable from the facts in *Wyncoop.* While Trend College was a private institution that received and administered no federal funds, the SCA is a government agency that received and administered substantial federal funds. In addition, Trend College received only indirect benefits through the increased enrollment of students receiving the government-guaranteed loans, while the SCA benefitted directly from the FAA funds when it administered the funds to effect noise abatement at Public Schools 42 and 52. Specifically, the Court finds that the SCA directly benefitted from the FAA funds by implementing the noise abatement project which enabled the SCA to further its mission of repairing the physical condition of New York City schools. The Court therefore finds that Defendants' reliance on the Ninth Circuit's holding in *Wyncoop* is misplaced.

Based on *United States v. Bonito,* 57 F.3d 167 (2d Cir.1995), *cert. den.,* —— U.S. ——, 116 S.Ct. 713, 133 L.Ed.2d 667 (1995), Defendant Tucker argues that the there is no connection between his alleged corrupt conduct and the protection of federal funds. In that case, the Second Circuit held that § 666 applies to the corruption of agents of a federally funded organization even in those official duties that do not implicate the organization's own funds. *Id.* at 172–73. In reaching this decision, the Second Circuit focused on the integrity of the federal funds themselves, stating: " 'It is sufficient that Congress seeks to preserve the integrity of federal funds by assuring the integrity of the organization that receives them.' " *Id.* at 172 (quoting *United States v. Westmoreland,* 841 F.2d 572, 578 (5th Cir.1988)). The court added, however, that

> [i]t would be quite another case if the corrupted business affected neither the financial interests of the protected organization nor ... federal funds directly.

*Id.* at 173.

Defendant Tucker contends that this language in *Bonito* illustrates the facts of the

present case. Tucker claims that his alleged corrupt conduct—bribery of an SCA employee—neither affected the financial interests of the Port Authority, which he asserts is the "protected organization" for purposes of § 666, nor federal funds directly. The Court has already established that the SCA is a protected organization which received $10,000 in federal funds within twelve months of the Defendants' alleged offenses. Further, the Court finds that the corrupt conduct alleged in the instant case clearly affected the financial interests and the integrity of the SCA. Accordingly, Defendant's argument must fail.

▉ Finally, Defendant Dransfield argues that, pursuant to § 666(c)[8], the $10,000 federal funding element cannot be proven because the funds received by the SCA constituted reimbursement and fees paid by the Port Authority for expenses incurred and services rendered in carrying out the noise abatement projects. Dransfield claims that his position is supported by the Second Circuit's opinion in *United States v. Rooney*, 986 F.2d 31 (2d Cir.1993) ("*Rooney I*"). In that case, however, the Second Circuit expressly rejected the argument that § 666 does not apply when the government receives something in return for its money. Rooney—a real estate developer who received a federal loan and used the proceeds to build a senior citizens housing project—was charged with violating 18 U.S.C. § 1001 (false statements to the government) and 18 U.S.C. § 666. Before trial the district court dismissed the § 666 count in the indictment, accepting Rooney's contention that a loan may not be considered a "benefit" for purposes of § 666(b). The Second Circuit reversed the district court's decision, holding that the loan proceeds constituted "benefits" notwithstanding the fact that Rooney was obliged to repay the loan with interest. *Rooney I*, 986 F.2d at 35. Upon reviewing the statutory language and history of § 666, the court in *Rooney I* concluded that

> the district court's focus on whether the Federal government receives something of value for its funds [was] misplaced. The

inquiry is not whether there is a quid pro quo, but, rather, whether the funds disbursed can be considered Federal assistance within a specific statutory scheme intended to promote public policy objectives and not payments by the government as a commercial entity.

*Id.*

Here, Defendant Dransfield claims that all funds received by the SCA are exempt under § 666 because the SCA is an entity for hire which receives payments from the government as a commercial entity. As discussed above, however, the SCA administers a government program and was specifically created to repair deteriorating conditions at New York City public schools. Accordingly, the Court finds that the funds received by the SCA "can be considered Federal assistance within a specific statutory scheme intended to promote public policy objectives."

After the Second Circuit reversed in *Rooney I*, Rooney was convicted on both the § 666 and § 1001 counts and he appealed. In *United States v. Rooney*, 37 F.3d 847 (2d Cir.1994) ("*Rooney II*"), the Second Circuit reaffirmed its prior holding that § 666 applied to Rooney's receipt of the federal loan. Although it reversed and remanded on other grounds, the court noted that the "usual" § 666 case involved facts where "a government employee or private individual demands or accepts a kickback, personal bribe, or gratuity from an individual in exchange for the awarding of a contract, the disbursement of federal funds, or some other favorable treatment." *Id.* at 850. In the present case, the alleged conduct of both Defendants Dransfield and Tucker fits squarely within this description.

In support of his quid pro quo argument, Defendant Dransfield also cites to the decision in *United States v. Webb*, 691 F.Supp. 1164 (N.D.Ill.1988). In that case, the court held that money paid by the government to an accounting firm for its services was excluded under § 666(c) because such money was quid pro quo. *Id.* at 1169–70. In *Rooney I*, however, the Second Circuit criticized

---

**8.** 18 U.S.C. § 666(c) states that "section [666] does not apply to bona fide salary, wages, fees, or other compensation paid, or expenses paid or reimbursed, in the usual course of business."

**712**

the decision in *Webb*, stating that "the Webb court's construction of the limitation on 'benefit' was broader that the facts of that case required, broader than Congress intended, and contrary to the stated purpose of § 666."[9] *Rooney I*, 986 F.2d at 35. The Court therefore finds that Dransfield's reliance on *Webb* is misplaced.

*United States v. Harloff*, 815 F.Supp. 618 (W.D.N.Y.1993), another case relied on by Defendant Dransfield, also fails to support his argument. The defendants in *Harloff* were Rochester, New York police officers charged with falsifying payroll records to indicate that they worked 40-hour weeks when in fact they worked fewer hours. The indictment charged that the difference between wages earned and wages paid constituted an embezzlement of funds pursuant to 18 U.S.C. § 666. On its own motion, the court held that such a prosecution was prohibited because salary payments are excluded from the statute's reach under § 666(c). *Id.* at 619. The court looked to the statutory language and history of § 666, and reasoned that Congress did not intend "to criminalize an employee's early departure from work, or even a group of employees' agreement to depart work early." *Id.*

The facts in the present case are distinguishable from the facts in *Harloff*. Here, the federal funds received and administered by the SCA were not salary payments. Furthermore, neither the SCA nor the Defendants were employees of the Port Authority or of the FAA. The SCA contractually agreed to receive the federal funds and to administer the funds to contractors who performed the work at P.S. 42 and P.S. 52, under the guidance of the SCA.

The Court is not persuaded by Defendant Dransfield's argument that the funds received by the SCA are exempt under § 666(c), and thus finds that the Defendants' alleged conduct falls within the scope of the statute.

## CONCLUSION

Based on the reasons stated above, Defendants' motions to dismiss the indictment are hereby DENIED.

SO ORDERED.

---

**9.** In *Rooney I*, the Second Circuit also commented on *United States v. Stewart*, 727 F.Supp. 1068 (N.D.Tex.1989), another case relied upon by Defendant Dransfield. The defendants in *Stewart* were employees of Bell Helicopter, a private entity that sold defense materials to the government, who allegedly stole goods from their employer. In that case, the court held that § 666 did not apply to the defendants because the government received a quid pro quo (the defense items it purchased) in exchange for commercial payments to Bell Helicopter. *Stewart*, 727 F.Supp. at 1072. In rejecting the application of a straight quid pro quo rule, the Second Circuit in *Rooney I* stated:

[I]n light of the statute's purpose, we think that Congress only intended to exclude money spent by the government as a commercial entity, such as payments for supplies or equipment. Stewart is consistent with this reading since that case involved a defense contractor that supplied custom-made goods to the government, which in essence is a purchase of equipment from a supplier.

986 F.2d at 34 (citing *United States v. Stewart*, 727 F.Supp. at 1070). In the present case, the funds received by the SCA do not constitute payments for supplies or equipment.