**UNITED STATES COURT OF APPEALS**
**TENTH CIRCUIT**
Office of the Clerk
Byron White United States Courthouse
Denver, Colorado 80257
(303) 844-3157

Patrick J. Fisher, Jr.                                                                Elisabeth A. Shumaker
Clerk of Court                                                                        Chief Deputy Clerk

March 30, 1999

**TO:** ALL RECIPIENTS OF THE OPINION

**RE:** 98-3146, *USA v. LaHue*

The slip opinion filed on March 23, 1999, contains a minor clerical error.  Please note the following correction.

1.  On page one, Nilesh P. Patel, should be corrected to Nilesh S. Patel.

Please make the corrections to your copy of the slip opinion.

Sincerely,
PATRICK FISHER, Clerk

Deputy Clerk

**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAR 23 1999**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

# UNITED STATES COURT OF APPEALS
# TENTH CIRCUIT

---

UNITED STATES OF AMERICA,

    Plaintiff-Appellant,

v.

ROBERT C. LAHUE, doing business as
Robert C. LaHue, D.O., Chartered,
doing business as Blue Valley Medical
Group; RONALD H. LAHUE,

    Defendants-Appellees,

No. 98-3146

---

Appeal from the United States District Court
for the District of Kansas
(D.C. No. 97-20031-JWL)

---

Sean Connelly, Attorney, Department of Justice, Denver, Colorado (Jackie N. Williams, United States Attorney, and Tanya J. Treadway, Asst. United States Attorney, District of Kansas, and William H. Bowne, Department of Justice, Washington, D.C., with him on the briefs), for Plaintiff-Appellant.

Jeffrey D. Morris, of Bryan Cave LLP, Overland Park, Kansas (James L. Eisenbrandt, of Bryan Cave LLP, Overland Park, Kansas, Nilesh S. Patel, Kansas City, Missouri, and Bruce Houdek, Kansas City, Missouri, with him on the briefs), for Defendants-Appellees.

---

Before **SEYMOUR**, Chief Judge, **EBEL** and **KELLY**, Circuit Judges.

_____

**SEYMOUR**, Chief Judge.

Defendants Dr. Ronald LaHue and Dr. Robert LaHue, agents of Blue Valley Medical Group (BVMG), were indicted on one count of conspiracy under 18 U.S.C. § 371 (count 1), seven counts of Medicare fraud under the Anti-Bribery Act, 18 U.S.C. § 666 (b) (counts 2 through 8), one count of conspiracy under 18 U.S.C. § 286 (count 9), and one count of witness tampering under 18 U.S.C. § 1512 (count 10). The district court granted defendants' motion to dismiss counts 2 through 8 on the theory that BVMG did not receive federal benefits as required by section 666(b) and therefore was not within the ambit of the statute.[1] _United States v. LaHue_, 998 F. Supp. 1182, 1184 (D. Kan. 1998). The government appeals, arguing that the alleged fraud falls within section 666(b) because BVMG was a recipient of Medicare reimbursements assigned to it by its patients. We

_____

[1] Section 666 provides in relevant part:

(a) Whoever, if the circumstance described in subsection (b) of this section exists–
    (1) being an agent of an organization, or of a State, local, or Indian tribal government, or any agency thereof–
. . . .
        (B) corruptly . . . accepts or agrees to accept, anything of value from any person, intending to be influenced or rewarded in connection with any business, transaction, or series of transactions of such organization, government, or agency involving anything of value of $5,000 or more;
. . . .
shall be fined under this title, imprisoned not more than 10 years, or both.
(b) The circumstance referred to in subsection (a) of this section is that the organization, government, or agency receives, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance.
18 U.S.C. § 666(a)(b).

affirm the district court.

# I

From 1985 to 1995, BVMG provided services in Kansas and Missouri as one of the largest geriatric care practices in the United States. Dr. Robert LaHue was president of BVMG and his brother, Dr. Ronald LaHue, was vice-president. The LaHues and other BVMG physicians provided medical services to nuing home residents and also referred patients to various hospitals for inpatient and outpatient care.

The indictment alleged that the LaHues engaged in a criminal scheme to receive bribes from various hospitals in return for referring Medicare patients to the hospitals. It asserted that the LaHues proposed and entered into a number of sham consulting agreements where BVMG received annual consulting "fees" from each hospital in amounts ranging from $50,000 to $150,000 in return for referring patients to the paying hospital. The government charged that the scheme constituted federal government program fraud in violation of section 666, which applies to an organization that receives "benefits" under a federal program.

The LaHues moved to dismiss the charges of program fraud, asserting that Medicare reimbursements to doctors are not benefits within the meaning of section 666(b). The district court agreed. The court determined that Medicare payments are extended by Congress to the patient, who is both the intended recipient of the funds and the intended

beneficiary of Medicare.  The patient is permitted voluntarily to direct the funds to the medical provider through assignment.  Under this pattern of disbursement, the district court held that reimbursements to BVMG physicians can not be characterized as section 666 benefits from a federal program because those benefits were disbursed to the patient before dissemination to BVMG.  Accordingly, the district court dismissed the claims against BVMG under section 666.[2]

## II

In reviewing the district court's determination, we must decide whether providers of medical services to Medicare Part B patients fall within the statutory jurisdiction of 18 U.S.C. § 666(b).  In other words, are the LaHues agents of an organization, BVMG, that "receive[d] *benefits* in excess of $10,000 under a Federal Program."  *Id.* (emphasis added) In making this determination, we look first at the nature of the Medicare program, and then assess section 666 in light of that program.

### A.  Medicare Part B

Many BVMG patients were eligible for Medicare reimbursements under 42 U.S.C. §§ 1395j-1395k and used the reimbursements to pay for BVMG services under Medicare

---

[2]After the dismissal, the government impaneled a new grand jury that indicted the LaHues for the same alleged conduct under an anti-kickback statute, 42 U.S.C. § 1320a-7b, which criminalizes the acceptance of bribes for Medicare patient referrals.

Act Part B. The Medicare Act consists of two parts: Part A, Hospital Insurance Benefits for the Aged and Disabled, 42 U.S.C. §§ 1395c- 1395i;[3] and Part B, Supplementary Medical Insurance Benefits for the Aged and Disabled, 42 U.S.C. §§ 1395j-1395w. Our case exclusively addresses Medicare Part B payments. Part B of the Medicare system was established to provide "benefits" to the individual beneficiary for use in paying the costs of certain medical services, including physicians' services. Part B is a voluntary program where beneficiaries pay monthly premiums that, along with federal government contributions, are remitted to the Federal Supplementary Medical Insurance Trust Fund. *See id.* § 1395t. The Department of Health and Human Services has responsibility for administering the program and contracts with private insurance carriers who evaluate and pay Part B claims out of the Trust Fund. *See id.* § 1395u.

Under Part B, a physician may either request direct payment by patients on the basis of an itemized bill or accept assignment agreements. Under an assignment agreement, the beneficiaries execute formal assignments of their individual benefits to the physicians to compensate the physicians for health care services. *See id.* § 1395u(h). A physician who does not accept assignment can charge her patient in excess of the Medicare allowed

---

[3]Part A concerns institutional health providers (hospitals, nursing homes, rural health clinics) and is funded out of Social Security taxes. Payment by Medicare under Part A for services rendered by a hospital or other institution may only be made to the institution, and the institution may not bill the patient directly, except for deductibles and coinsurance. Part A is not implicated under the government's theory in this case.

expense, a practice called "balance billing." Medicare pays eighty percent of reasonable

reimbursable claims while the beneficiary is responsible for the remaining twenty percent

and any "balance billing." *See* 42 U.S.C. § 1395*l*. The dismissed charges at issue here all

involved patient assignments directing that their Medicare reimbursements be sent to the

BVMG physicians to pay for medical services rendered. A BVMG physician who

accepted assignment agreed to accept a specified amount as full payment for each service.

This assignment scheme implies that the intended beneficiary of Medicare Part B is the

patient. The Medicare statute reinforces this interpretation. It provides in relevant part:

> **Scope of benefits; definitions**
>
> (a) The benefits provided to an individual by the insurance program
> [Medicare] established by this part shall consist of --
>     (1) entitlement to have payment made to him or on his behalf
>         (subject to the provisions of this part) for medical and other
> health services . . . .

42 U.S.C. § 1395k. As the statute reads, "benefits" are "provided to an individual," who

has the authority to direct whether they are to be paid "to him or on his behalf." *Id.* With

this in mind, we turn to an analysis of section 666.


**B. 18 U.S.C. § 666**

We review legal issues of statutory construction de novo. *United States v. Oberle*,

136 F.3d 1414, 1423 (10th Cir. 1998). In interpreting section 666, we recognize that the

Supreme Court directs us to use restraint in interpreting federal criminal statutes. *Dowling*

*v. United States*, 473 U.S. 207, 214 (1985).  "Courts in applying criminal laws generally must follow the plain and unambiguous meaning of the statutory language."  *Salinas v. United States*, 118 S.Ct 469, 474 (1997) (quoting *United States v. Albertini*, 472 U.S. 675, 680 (1985)).  Where the statute is ambiguous, we look to the legislative history and the underlying public policy of the statute.  *See United States v. Simmonds*, 111 F.3d 737, 742 (10th Cir. 1997).

The Anti-Bribery Act, 18 U.S.C. § 666, prohibits the unlawful acceptance of anything of value of $5,000 or more if the person taking the bribe is an agent of an organization subject to the statute.  Whether an organization falls within the scope of the statute is determined pursuant to the limits of section 666(b), which reads:

> The circumstances referred to in subsection (a) of this section is that the organization, government, or agency receives, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance.

18 U.S.C. § 666(b).  The district court acknowledged the superficial appeal of the government's contention that the plain language of section 666(b) includes the patient assignments to BVMG.  *See LaHue*, 998 F. Supp. at 1187.  The scope of section 666(b) jurisdiction reaches any organization that "receives . . . benefits" from a federal program in an amount over $10,000.  18 U.S.C. § 666(b).  Medicare is indisputably a federal program and BVMG did receive reimbursements in any one year in excess of $10,000 for its physicians' services to Medicare recipients.

In support of this argument, the government offers an analogy to anti-

discrimination statutes, contending that "section 666 'expressly equates "benefits" with "Federal assistance."'" Br. of Aplt. at 15 (quoting *United States v. Rooney*, 986 F.2d 31, 34 (2d Cir. 1993)).  The government then directs us to cases holding that providers who accept Medicare funds receive "federal assistance" under an anti-discrimination statute. *Id.* at 16 (citing *United States v. Baylor Univ. Med. Ctr.*, 736 F.2d 1039, 1042-48 (5th Cir. 1984)). The government concludes by analogy that a health care provider who accepts Medicare funds thereby receives federal benefits and accordingly falls within the scope of section 666.

We are not persuaded by the analogy to anti-discrimination statutes, which are civil rather than criminal.  We must exercise particular restraint in interpreting federal criminal statutes.  *Dowling*, 473 U.S. at 214.  Moreover, there are inherent policy differences between these criminal and civil statutes.[4]  Section 666 was designed to prevent diversions of federal funds enroute to their intended beneficiaries, whereas the anti-discrimination statutes were enacted to prevent the use of federal funds to support discrimination.  *See United States v. Wyncoop*, 11 F.3d 119, 123 (9th Cir. 1993) (Title IX anti-discrimination provision different in purpose and language from section 666).

Finally, like the district court, we believe that a closer look at the government's position reveals ambiguity in the plain meaning of section 666.  Under the government's

---

[4] We note in this regard that in *United States v. Baylor Univ. Med. Ctr.*, 736 F.2d 1039 (5th Cir. 1984), the court expressly grounded its holding on the legislative history of the anti-discrimination statutes, judicial decisions construing them, and regulations adopted under them. *See id.* at 1042.

interpretation of section 666(b), any organization that is assigned $10,000 in a year in funds initially disbursed under a federal program source would fall within the statute. Thus, when funds have passed to the beneficiary and she assigns the funds further to any number of organizations which may assign them even further, the government's theory suggests that these monies are all considered benefits as long as they originated under a federal benefits program. Presumably under this interpretation, if the recipient physician endorsed Medicare checks to pay a supplier of medical goods, the supplier would be receiving benefits from a federal program. As the district court aptly noted, this construction creates almost a limitless statutory reach beyond a plain commonsense interpretation of the statute. *See LaHue*, 1182 F. Supp. at 1187.[5] Even in the context of anti-discrimination statutes, the Supreme Court has distinguished between direct and indirect beneficiaries, holding that "federal coverage [does not follow] the aid past the recipient to those who merely benefit from the aid." *United States Dept. of Trans. v. Paralyzed Veterans of America*, 477 U.S. 597, 607 (1986) (construing 29 U.S.C. § 794 prohibition against subjecting handicapped individuals "to discrimination under any

---

[5]We note that § 666(c) refines § 666(b) by carving out certain transactions in the ordinary course of business: "This section does not apply to bona fide salary, wages, fees, or other compensation paid, or expenses paid or reimbursed, in the usual course of business." 18 U.S.C. § 666(c). *Cf. United States v. Copeland*, 143 F.3d 1439 (11th Cir. 1998) (holding § 666(b) inapplicable to defense contractor without referencing § 666(c)). Neither the parties nor the district court addressed § 666(c), however. Since there are no circuit cases addressing § 666(c)'s application to § 666(b), we leave that analysis for another day. *See United States v. Grossi*, 143 F.3d 348, 350-51 (7th Cir. 1998) (declining to decide whether certain payments have met § 666(c) requirements where the parties did not argue the issue below); *United States v. Mills*, 140 F.3d 630 (6th Cir. 1998) (determining that § 666(c) applies to § 666(a)). We merely introduce § 666(c) as an additional legal wrinkle that contributes to the ambiguity of § 666(b).

program or activity receiving Federal financial assistance.").  In so holding, the Court

pointed out that if the statutes were construed to extend to all those who receive an indirect

economic benefit from the federal assistance, "[t]he statutory 'limitation' on [the anti-

discrimination statute's] coverage would virtually disappear, a result Congress surely did

not intend."[6]  *Id.* at 609.  Similarly, in our judgment, the implausibility that Congress

intended this limitless result in a criminal statute creates an ambiguity regarding the

meaning of just who "receives . . . benefits . . . under a Federal Program," within the

meaning of section 666(b).

Like other courts that have wrestled with an interpretation of section 666(b), we

look to the legislative history and the underlying purpose of the statute for guidance.  *See*

*United States v. Copeland*, 143 F.3d 1439, 1441 (11th Cir. 1998); *United States v. Rooney*,

37 F.3d 847, 850-51 (2d Cir. 1994); *United States v. Wyncoop*, 11 F.3d 119, 121 (9th Cir.

1993).  The legislative history reveals that although Congress intended "federal programs"

---

[6] In *New York Conference of Blue Cross v. Travelers Ins. Co.*, 514 U.S. 655 (1995), the Supreme Court similarly refused to extend a statutory phrase to its full expansive meaning.

> The governing text of ERISA is clearly expansive. Section 514(a) marks for pre-emption "all state laws insofar as they . . . *relate* to any employee benefit plan" covered by ERISA, and one might be excused for wondering, at first blush, whether the words of limitation ("insofar as they . . . relate") do much limiting. *If "relate to" were taken to extend to the furthest stretch of its indeterminancy, then for all practical purposes pre-emption would never run its course, for "[r]eally, universally, relations stop nowhere,"* H. James, Roderick Hudson xli (New York ed., World's Classics 1980).  But that, of course, would be to read Congress's words of limitation as mere sham . . . .

*Id.* at 655 (emphasis added).

to be broadly construed, Congress also intended to limit the statute to be consistent with its underlying purpose to "protect the integrity of the vast sums of money distributed through federal programs from theft, fraud, and undue influence by bribery." S. Rep. No. 95-225, at 370 (1984), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3511. As further explained by our sister circuit, the purpose of section 666 is

> to prevent diversions of federal funds not only by agents of organizations that are direct beneficiaries of federal benefits funds, but by agents of organizations to whom such funds are 'disbursed' for further 'distribut[ion]' to or for the benefit of the individual beneficiaries.

*United States v. Zyskind*, 118 F.3d 113, 116 (2d Cir. 1997).

When Congress enacted section 666, it cited three cases that represent the types of situations section 666 was intended to cover. *See* S. Rep. No. 95-225, at 370 nn. 2 & 3, *reprinted in* 1984 U.S.C.C.A.N. at 3182, 3511 nn. 2 & 3; *see also Salinas*, 118 S.Ct. at 474 (discussing legislative history). In all three cases, the organization in question received federal program funds as the intended recipient, and each was charged with the responsibility for administering or spending the federal grant monies to benefit the intended beneficiaries. In *United States v. Del Toro*, 513 F.2d 656, 661 (2d Cir. 1975), the Harlem-East Harlem Model Cities Program (Model Cities) received funds for revitalization projects in inner city areas. Model Cities had the responsibility to administer and disburse funds to benefit the communities. In *United States v. Hinton*, 683 F.2d 195, 196 (7th Cir. 1982), United Neighborhoods, Inc. (UNI) entered into contracts with the city of Peoria, Illinois, to administer federal funds under a Community Development Block

Grant from HUD. The intended beneficiary, again, was the community and UNI was charged with the administration and disbursement of federal funds to benefit that community. In *United States v. Mosley*, 659 F.2d 812, 813 (7th Cir. 1981), the State of Illinois Bureau of Employment Security as part of the Comprehensive Employment and Training Program administered employment and training programs for the unemployed, the intended beneficiaries. The Bureau received the funds and had the responsibility to administer them to benefit the unemployed. None of the cases represent a situation where the beneficiary had already received the benefits.

The purpose of section 666 to prevent the diversion of federal program funds on the distribution path to the intended beneficiaries is fulfilled once the funds have been received by the actual beneficiary. Cases interpreting section 666(b) support this conclusion. In *Wyncoop*, 11 F.3d 119, a private college participated in federal student loan programs. The issue was whether the college's receipt of tuition payments funded by the loans qualified as receipt of benefits under section 666. In the program, the government guaranteed the student's loan and a private bank then issued a check, often jointly to the student and the college. The student was the intended beneficiary of the loans. The college had no responsibility to administer or disburse the funds to the student. The court held that "the statute was not intended to cover thefts from institutions like Trend College that do not themselves receive and administer federal funds." *Id.* at 122.

In both *Wyncoop* and the instant case, the beneficiary had discretionary rights to the

money.  Although the court in *Wyncoop* did not emphasize the fact, we believe it was important to the outcome of the case that the checks were issued either to the students or jointly to the students and the school.  The loans were thus made to the students and passed on to the college in the form of tuition payments.  As such, the court's ultimate determination that the college did not receive "benefits" within the meaning of section 666(b) is consistent with our conclusion in this case.  Here, the private insurance company administering the Medicare benefits issued a check to the BVMG physician only after an assignment of the fees by the patient to the physician.

In *Zyskind*, 118 F.3d 113, the issue was whether an adult home that received federal funds as a contracted fiduciary thereby received a benefit within the meaning of section 666(b).  The home, Hi-Li, served handicapped or mentally impaired adults.  Most of the residents received federal benefits from either the Social Security Administration or the Department of Veterans Affairs.  The statutory scheme envisioned that the federal funds could be paid to a caretaker or custodian in a fiduciary capacity for the benefit of the veteran.  *Id.* at 115.  Under that scheme, some benefit checks were made payable directly to the Hi-Li administrator as legal custodian of the veteran.  The court held that since the funds reached Hi-Li before the veterans and Hi-Li was required to administer the funds on behalf of these intended beneficiaries, Hi-Li fell within section 666 jurisdiction.  *Id.* at 117.

*Zyskind* is distinguishable from the instant case.  There, Hi-Li received the money

-13-

directly and was charged with a fiduciary responsibility to use the money for the benefit of the intended beneficiary, the resident. True to the purposes of section 666 to protect federal funds enroute to the beneficiary, the court upheld section 666 coverage over Hi-Li. By contrast, BVMG was merely accepting each patient's payment by voluntary assignment for services already rendered. BVMG had no power or duty to administer or disburse the funds further to the benefit of its Medicare patients.[7]

We conclude that Congress intended the reference in section 666(b) to an organization receiving federal program benefits to mean one that receives benefits before final distribution to the intended beneficiary, here the patient. What happens to the funds once the patient receives them is beyond the scope of section 666. Thus, any assignment of such funds to a third party does not constitute a receipt of federal program benefits within the reach of section 666. We are not persuaded it was Congress's intent in enacting section 666(b) to follow the intended beneficiaries' further distribution of the federal benefits. As a result, we hold that BVMG falls outside the scope of section 666.

We **AFFIRM** the district court.

---

[7]The government argues that "basing statutory coverage on whether federal payments are for past or future services . . . has been rejected as 'frivolous.'" Br. of Aplt. at 20 (citing *Baylor University,* 736 F.2d at 1048). What the government ignores is that *Baylor University* was a civil case and involved Medicare Part A. Medicare Part A is a different scheme where all payments to the hospitals are direct, without the voluntary choice of the patient. We need not decide whether the scope of section 666 would extend to such a case.