155 B.R. 263 (1993)
In re Francis E. DORSEY, Debtor.
FIRST NATIONAL BANK OF BAR HARBOR, Plaintiff,
v.
UNITED STATES of America, DEPARTMENT OF AGRICULTURE, FARMERS HOME ADMINISTRATION and Francis E. Dorsey, Defendants.
Bankruptcy No. 92-10554, Adv. No. 92-1042.
United States Bankruptcy Court, D. Maine.
June 10, 1993.
Steven E. Cope, Cope & Cope, Portland, ME, for debtor.
*264 Richard Silver, Russell, Lingley & Silver, Bangor, ME, for First Nat. Bank of Bar Harbor.
Nancy Torresen, Office of U.S. Atty., Bangor, ME, for Farmers Home Admin.

MEMORANDUM OF DECISION
JAMES B. HAINES, Jr., Bankruptcy Judge.
This adversary proceeding has been submitted for decision on stipulated facts. First National Bank of Bar Harbor ("FNBBH") and the Farmers Home Administration ("FmHA") each claim superior rights in six FNBBH certificates of deposit in the total sum of $184,051.84.[1]
For the reasons set forth below, I conclude that FNBBH holds the certificates as security for two loans issued to the debtor, Francis E. Dorsey, totalling in excess of $180,000.00. Any surplus is unencumbered.[2]

Facts
Francis E. Dorsey ("Dorsey"), the debtor, was party to a series of written loan agreements with FmHA in connection with three rural rental housing projects known as Whim Station I, Whim Station II and Whim Station Associates, located in Old Town, Maine.
On April 2, 1980, Dorsey and his wife borrowed $850,000.00 for Whim Station I. On February 10, 1984, they borrowed $960,000.00 for Whim Station II. On June 8, 1990, Whim Station Associates, a general partnership of which the Dorseys were the general partners, borrowed $1,231,733.68. Each of the loans was documented by a promissory note, loan agreement, security agreement and a real estate mortgage, including an assignment of leases and rents. The security agreement granted FmHA a security interest in certain collateral and proceeds as follows:
All contract rights, accounts receivable, general intangibles, and gross receipts now or hereafter in existence, including the proceeds thereof, derived from or pertaining to any and all activities of the Debtor in operating a rural rental housing project. . . . [3]
The real estate mortgages for each loan included an assignment of rents in the following terms:
Borrower does hereby grant, convey, mortgage, assign and forever warrant unto the government the following property [description of real estate] together with all rights, interests, easements, hereditaments and appurtenences thereunto belonging, the rents, issues and profits thereof and revenues and income therefrom. . . . [4]
Each mortgage included a clause articulating FmHA's rights on default. Those rights included the right to accelerate indebtedness, to repair and maintain the mortgaged premises, to take possession of and operate the premises, to obtain appointment of a receiver "with the usual powers of receivers in like cases," to foreclose the mortgage and to "enforce any *265 and all other rights and remedies. . . . "[5]
With respect to each loan, Dorsey agreed to fund reserve accounts with all available housing project revenues, viz. rents, and to hold those reserve accounts "in trust" as security for his obligations under the loans.[6] The Whim Station I agreement dictated that funds in the reserve account "be used only as authorized in this agreement and until so used shall be held by the Borrower in trust as security for the loan obligations."[7] With FmHA's consent, those funds could be used to make loan payments, to fund repairs and replacements, to improve or extend the project, or to pay the borrower approved dividends.[8] The Whim Station II and Whim Station Associates loan agreements did not include similar language. However, they incorporated by reference FmHA regulations requiring that "all funds received and held in any account, except the security deposit, membership fee, management reserve (patronage capital) shall be held in trust by the borrower for the loan obligation until used."[9]
Dorsey established the required accounts at Fleet Bank of Maine ("Fleet") and funded them exclusively with collected rents.[10] The reserve accounts were established first as savings accounts. As deposits mounted, Dorsey purchased certificates of deposit.[11] As of February 19, 1992, Dorsey held $174,685.67 in "reserve funds" in savings accounts and certificates of deposit at Fleet.[12]
Although Dorsey's use of reserve funds was contractually circumscribed, he had unqualified access to them. Prior to 1991, without FmHA's knowledge or consent, Dorsey borrowed money from Fleet, pledging the reserve accounts.[13] But in 1991 Fleet refused any longer to accept those accounts as collateral and demanded that Dorsey pay down the loans they secured. Robert O'Malley, a Fleet officer, suggested that Dorsey transfer the reserve funds to another bank, borrow against them there, and use the proceeds to pay Dorsey's outstanding obligations to Fleet.[14]
Dorsey contacted Tom McKay, an officer of FNBBH and inquired regarding the possibility that he might transfer funds to FNBBH from Fleet and utilize them as collateral for a $150,000.00 loan.[15] Dorsey did not inform FNBBH that the funds were in reserve accounts maintained pursuant to his agreement with FmHA. Nor did FNBBH's representatives inquire of Dorsey regarding the source of the funds to be transferred. No one from Fleet informed anyone from FNBBH that the funds in question were held in the names of the Whim Station projects or that Fleet had *266 refused to accept the funds as collateral.[16] McKay assigned Susan Hart, an FNBBH loan officer, to arrange the details of funds transfers and to document a $150,000.00 secured loan to Dorsey.[17] Robert Bassett handled the transaction from Fleet's end.[18]
On February 19, 1992, on Dorsey's instructions, Bassett closed the Fleet accounts and redeemed the Fleet certificates of deposit. Before transferring the funds to FNBBH, Bassett set off $71,453.15 to reduce principal and interest outstanding on Dorsey's obligations to Fleet. He wire transferred the balance, $103,232.52, to FNBBH.[19]
FNBBH had expected to receive approximately $174,000.00. When it received only $103,232.52, Hart spoke with McKay. He instructed her to document the $150,000.00 loan with, inter alia, a promissory note and a certificate of deposit assignments.[20] Dorsey told Hart that he wished to maintain funds on deposit in the same amounts as had been on deposit with Fleet before the transfer took place. She therefore took $71,453.15 from the loan proceeds and added it to the funds transferred from Fleet so that $174,685.67 was available for FNBBH certificates of deposit.[21] The balance of the loan proceeds, $78,546.85 was paid to Dorsey. He used some of the funds to pay down his obligations to Fleet.[22]
At the close of business on February 10, 1992, FNBBH held six certificates of deposit in Dorsey's name, totalling $174,685.67.[23] By written assignment, Dorsey pledged five of the certificates to FNBBH to secure the $150,000.00 loan.[24] On March 5, 1992, Dorsey borrowed an additional $19,000.00 from FNBBH, assigning the sixth certificate of deposit to secure repayment.[25]
FNBBH has held all six certificates of deposit continuously since February 19, 1992.[26] It did not learn that FmHA claimed an interest in the funds until May 15, 1992.[27]
Dorsey filed his petition for relief under Chapter 11 on July 24, 1992. As of April 5, 1993, Dorsey owed FNBBH $159,439.61 on the $150,000.00 loan, and $20,636.60 on the $19,000.00 loan.[28] Funds in the five certificates of deposit securing the $150,000.00 loan add up to $163,362.60. The sixth certificate, securing the $19,000.00 loan, has a balance of $20,689.24.[29]

Discussion
FmHA's claim to an interest superior to FNBBH in the disputed funds fails for several reasons. First, under the rents assignment, it obtained no lien on rents collected by Dorsey. Thus, it cannot "trace" collected rents into funds held by FNBBH (or, previously, by Fleet). Its perfected security interest in other assets provided it no claim against accounts and certificates at Fleet. Finally, it cannot overcome FNBBH's position as an assignee of *267 the certificates of deposit in which the collected rents are now held.
1. FmHA's Rights Under the Assignment of Rents.
In this contest between creditors claiming contradictory rights in the same funds, the rule of decision is supplied by state law. See Butner v. U.S., 440 U.S. 48, 55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979).[30] FmHA holds an assignment of rents for each of the three Whim Station housing projects. The funds in which FmHA asserts priority are un-commingled, collected rents from the Whim Station projects.
Maine law validates assignments of rents. Fleet Bank of Maine v. Zimelman, 575 A.2d 731, 732 (Me.1990). However, there exists no Maine authority regarding the effect of such assignments on the assignor's, the assignee's or third parties' rights to collected rents. I must therefore determine the law that Maine courts would apply if faced with the issue. People's Heritage Sav. Bank v. Recoll Mgmt., Inc., 814 F.Supp. 159, 166 (D.Me.1993).
Having perused the law of other jurisdictions, I conclude that Maine courts would apply one determinative precept universally applied elsewhere: As the holder of an assignment of rents given as security for repayment of its loan, FmHA acquired no immediate right to rents as they were collected by Dorsey. Thus, it holds no right to the funds now held by FNBBH by virtue of the rent assignments.[31] A brief explanation follows.
FmHA recognizes that its rights and priority under the assignment of rents, as such, are not determined by Article 9 of the Uniform Commercial Code.[32] Article 9 excludes from its coverage interests in and liens upon real estate, including assignments of leases and rents. 11 M.R.S.A. § 9-104(10). The creation, perfection, priority and enforcement of assignments of rents are governed by principles of real property law. In re Green Corp., 154 B.R. 819 (Bankr.D.Me.1993); In re Somero, 122 B.R. 634, 638 (Bankr.D.Me.1991) (citing Weeks v. Thomas, 21 Me. 465 (1842)). See also In re GOCO Realty Fund I, 151 B.R. 241, 246 n. 2 (Bankr.N.D.Cal.1993). See generally Randolph, supra n. 31, at 283 n. 5; McCafferty, supra n. 31, at 438-38.[33]
*268 Assignments of rents may be perfected in the sense that the assignee may establish earlier (and therefore superior) lien rights against competing interests, such as those of subsequent lien creditors, by recording the assignment in the real property records. See, e.g., In re Vienna Park Properties, 976 F.2d 106, 112-13 (2d Cir.1992) (Virginia law); Prudential Ins. Co. of America v. Liberdar Holding Corp., 74 F.2d 50, 51 (2d Cir.1934) (A. Hand, J.; N.Y. law); Bank of Edwardsville v. J.D. Monarch Dev. Co. (In re J.D. Monarch Dev. Co.), 153 B.R. 829, 833 (Bankr.S.D.Ill.1993) (Illinois law); In re Somero, 122 B.R. at 638-39 (Maine law); In re Rancourt, 123 B.R. at 147; In re Park at Dash Point L.P., 121 B.R. 850, 855 (Bankr.W.D.Wash.1990) (Washington law), aff'd, 985 F.2d 1008 (9th Cir.1993). But something more than perfection in the U.C.C. sense is required for the assignee to take the rents. See, e.g., In re Vienna Park Properties, 976 F.2d at 113; In re GOCO Realty Fund I, 151 B.R. at 247-48 (California law); In re Rancourt, 123 B.R. at 148. See also Randolph, supra n. 31.
Although the enforcement steps required vary, most states require that the holder of a valid, recorded assignment of rents affirmatively "enforce" the assignment before it can collect the rents, or obtain priority in prospective rents, over late-coming creditors or a bankruptcy trustee. See, e.g., In re Vienna Park Properties, 976 F.2d at 114) (take possession directly or through receiver); Great West Life Assurance Co. v. Rothman (In re Ventura-Louise Properties), 490 F.2d 1141, 1145 n. 1 (9th Cir. 1974) (California law, demand rents or possession); Bank of Cal. v. McQuaid (In re Fed. Shopping Way), 457 F.2d 176, 179 (9th Cir.1972) (obtain possession by foreclosure and sale under Washington statute then in effect); Balcor Pension Investors v. Wiston XXIV Ltd. Partnership (In re Wiston XXIV Ltd. Partnership), 147 B.R. 575, 579-80, 582-83 n. 10 (D.Kan.1992) (Kansas law, obtain appointment of receiver or invoke other legal process), appeal dismissed, 988 F.2d 1012 (10th Cir.1993); In re SeSide Co. Ltd., 152 B.R. 878 (E.D.Pa.1993) (Pennsylvania law, take actual possession or take constructive possession by making demand for rents on tenants); In re GOCO Realty Fund I, 151 B.R. at 246-47 (California law); In re Rancourt, 123 B.R. at 147 (N.H. law, take possession).
In some jurisdictions the assignee is entitled to collect rents upon the assignor's default, without taking an affirmative step to enforce the assignment. See, e.g., F.D.I.C. v. Int'l Prop. Mgmt., 929 F.2d 1033, 1037-38 (5th Cir.1991) (Texas law). But see Randolph, supra n. 31 at 301 (noting practical problems posed by such an approach).
The cases reflect differences regarding the method and manner by which an assignee of rents "activates" its rights, regarding the need (if any) for "enforcement" action and regarding a rent assignee's vulnerability to the rights of later lien creditors or a bankruptcy trustee. All of these points are beyond the scope of today's ruling. The authorities are unanimous in holding that, absent extraordinary contractual terms, a rent assignee does not obtain an immediate right to take the rents upon execution of the assignment or upon its recordation. Cf. In re Somero, 122 B.R. at 638 (parties may modify right to rents by contract) (citing Weeks v. Thomas, 21 Me. at 467).[34] The assignee's right to collect rents or to take them as they are collected matures, at the earliest, upon the *269 assignor's default of the obligation secured by the assignment.
In this case, the right to prospective rents is not at issue.[35] The dispute centers on FmHA's claim of priority rights in collected rents that came into Dorsey's hands long ago. Dorsey was not in breach of the Whim Station loan agreements when he collected the rents that now rest in the FNBBH certificates of deposit.[36] Thus, FmHA acquired no rights in those funds by virtue of the rent assignment.[37]
2. Other Sources of FmHA Rights.

a. The "Trust" Provisions.

The Whim Station loan agreements call for Dorsey to hold rents collected in certain accounts, and to hold sums in the reserve accounts "in trust as security for the loan obligations." Even so, FmHA cannot effectively argue that the reserve account funds were held in a bona fide trust that divested Dorsey of the capacity to pledge or spend them.
The loan agreements bound Dorsey contractually to maintain specified accounts for collected rents and to use those funds, after other approved uses, to repay his obligations to FmHA. However, the loan documents do not evidence the parties' intention to create a trust. They do not contain an explicit declaration creating a trust. There was no res extant. Thus, the collected rents were not held in trust. Shiro v. Drew, 174 F.Supp. 495, 499-500 (D.Me.1959); In re Brown, 131 B.R. 900, 905 (Bankr.D.Me.1991). See Dixon v. Dixon, 123 Me. 470, 472, 124 A. 198 (1924) (express trust requires explicit declaration).
Reading the "trust" provisions broadly, the most that can be said is that they may have operated to grant FmHA a security interest in collected rents. As discussed below, however, such an interest cannot prevail here.

b. The FmHA Security Interest.

In addition to the rent assignment and the "trust agreement," Dorsey granted FmHA a security interest in "all contract rights, accounts receivable, general intangibles and gross receipts . . . including the proceeds thereof" derived from the Whim *270 Station projects as security for his obligations to FmHA. FmHA might claim that the funds now in the FNBBH certificates of deposit are subject to its lien by the terms of the security agreement.[38]
Dorsey deposited collected rents at Fleet Bank: first, in savings accounts, later, in certificates of deposit as well. Savings accounts are "deposit accounts" for purposes of Article 9. 11 M.R.S.A. § 9-105(1)(e). And Article 9 does not govern "the transfer of any interest in any deposit account . . . except as provided with respect to proceeds, § 9-306, and priorities in proceeds, § 9-312." 11 M.R.S.A. § 9-104(12).
Aside from its tracing arguments,[39] FmHA can point to no way that it acquired an interest in the savings accounts. Because FmHA has not established rights in the collected rents, even if the funds on deposit were considered "proceeds",[40] they were not proceeds of property in which FmHA had rights. Thus, the rules of §§ 9-306(3) and 9-312 could have no application here.
Even more importantly, the funds' character as deposit accounts was only fleeting. They became certificates of deposit, "instruments" in the parlance of Article 9, 11 M.R.S.A. § 9-105(1)(i), a medium in which FmHA's claimed continuing security interest simply vanishes. FNBBH possesses all six certificates. Each has been assigned to it in writing by Dorsey. FmHA holds nothing of the kind. Under the circumstances, and whether or not the certificates are negotiable (a fact not in the record), FmHA is incapable of obtaining priority over FNBBH. FNBBH received unencumbered funds from Fleet, issued its certificates of deposit and took assignments of them without knowledge of FmHA's claims. See 11 M.R.S.A. §§ 9-105(1)(i) (defining "instruments") and 9-308 (priorities in nonnegotiable instruments) and 9-309 (priorities in negotiable instruments). See generally 9 Ronald A. Anderson, Anderson on the Uniform Commercial Code §§ 9-308:6 and 9-309:5 (1985 & Supp.1992).

Conclusion
Because FmHA's right to rents from the Whim Stations housing projects under the rent assignments remained dormant during the period that Dorsey collected the funds at issue here, it had no rights to the rents as they were collected. Because it acquired no rights in those funds, it cannot trace them into FNBBH's hands to assert priority. Moreover, FmHA has no rights in the FNBBH certificates of deposit under any other theory.
I therefore conclude that, to the extent of Dorsey's obligations to FNBBH, and to the extent each such obligation is secured by the certificates of deposit FNBBH holds, FNBBH has first priority claim. To the extent that funds represented by the certificates may exceed the FNBBH obligations, those funds are not encumbered by any claim, lien or right of FmHA.
A separate order consistent with this opinion will issue forthwith.
NOTES
[1] The action was initiated by FNBBH's complaint to determine the extent and priority of liens. Jurisdiction lies under 28 U.S.C. § 1334 and the U.S. District Court's order of reference. This is a core matter under 28 U.S.C. § 157(b)(2)(K). The parties have consented to entry of final judgment by the bankruptcy court. Pretrial Scheduling Order, Court Doc. No. 6, dated November 4, 1992.
[2] The facts are undisputed and the parties' respective exhibits have been incorporated in a comprehensive stipulation. See Parties' Stipulation of Facts (hereafter "Stipulation"), Court Doc. No. 15. This memorandum sets forth conclusions of law in accordance with Fed. R.Bankr.P. 7052.
[3] Stipulation at ¶ 2. FmHA Exhibits A-4 at 2, B-5 at 2 and C-5 at 2. Each security agreement is perfected by financing statement filings at the Maine Secretary of State's Office in accordance with Maine law. Stipulation at ¶ 3, n. 1.
[4] FmHA Exhibits A-2 at pages 1-3; B-2 at 1-3, B-3 at 1, 6 (emphasis added). The Whim Station Associates partnership mortgage employs slightly different language, but the parties agree that, for purposes of the issues pending before this court, it is substantively identical. FmHA Exhibit C-3 at 2, 4.
[5] FmHA Exhibit A-2 at 4 ¶ 17; B-2 at 4, ¶ 17; B-3 at 7, ¶ 17. Again, the Whim Station Associates mortgage varies slightly, but is, in substance, identical. FmHA Exhibit C-3 at 8 ¶ 21.
[6] FmHA Exhibit A-3 at ¶ 8; B-4 at ¶ 4.b; and C-4 at ¶ 5.b.
[7] FmHA Exhibit A-3 at page 3, ¶ 8.
[8] Id.
[9] Stipulation at ¶ 4, n. 2.
[10] Stipulation at ¶¶ 6, 7.
[11] Stipulation at ¶ 6.
[12] The various accounts and certificates, their balances and the project to which each related were:

 Account No. Balance Project
 # 6533248 $14,209.37 Whim Station I
 # 6533221 $ 5,282.16 Whim Station II
 # 799920 $19,636.38 Whim Station Associates
 # 354325 $15,690.80 Whim Station Associates
 CD# XXXXXXXXXX $61,023.18 Whim Station I
 CD# XXXXXXXXXX $58,843.78 Whim Station II

Stipulation at ¶ 6.
[13] Stipulation at ¶¶ 8, 9.
[14] Stipulation at ¶ 8.
[15] Stipulation at ¶ 10.
[16] Stipulation at ¶ 12.
[17] Stipulation at ¶ 10.
[18] Stipulation at ¶ 12, 13.
[19] Stipulation at ¶ 13.
[20] Stipulation at ¶ 15.
[21] Stipulation at ¶ 18.
[22] Stipulation at ¶ 19.
[23] FNBBH Exhibit 1.
[24] Dorsey assigned to FNBBH the following certificates, in the following amounts, on February 10, 1992:

 Account No. Amount
 CD# 9813624 $13,209.37
 CD# 9813659 $61,023.18
 CD# 9813683 $ 5,282.16
 CD# 9813713 $58,843.78
 CD# 9813780 $15,690.80

FNBBH Exhibit 4.
[25] Stipulation at ¶ 23. Dorsey executed a promissory note and a separate assignment of CD# 9813756, in the amount of $19,636.38, on March 5, 1992. FNBBH Exhibits 5 and 6.
[26] Stipulation at ¶ 22.
[27] Stipulation at ¶ 25.
[28] Stipulation at ¶ 26. FNBBH has incurred attorney's fees and collection costs, as well. Their amount is not presently at issue.
[29] Stipulation at ¶ 27.
[30] Butner was decided under the Bankruptcy Act of 1898. Its teaching remains valid under the Code. See Barnhill v. Johnson, 503 U.S. ___, ___, 112 S.Ct. 1386, 1390, 118 L.Ed.2d 39 (1992); In re Public Service Co. of N.H., 884 F.2d 11, 14 (1st Cir.1989); In re Cormier, 147 B.R. 285, 289 n. 18 (Bankr.D.Me.1992).
[31] In many regards, the rights of rents assignees, particularly in bankruptcy, are not well-settled elsewhere. See In re Rancourt, 123 B.R. 143, 146 (Bankr.D.N.H.1991). See also Patrick A. Randolph, Jr., Recognizing Lenders' Rents Interests in Bankruptcy, 27 Real Prop., Prob. & Tr. J. 281 (1992) (hereafter "Randolph"); James McCafferty, The Assignment of Rents in the Crucible of Bankruptcy, 94 Comm.L.J. 433 (1989) (hereafter "McCafferty"). But, so far as need be ascertained and applied to resolve this case, there is virtual unanimity.
[32] References to the Uniform Commercial Code are to Maine's codification, found in Title 11 of the Maine Revised Statutes Annotated, 11 M.R.S.A. § 1-101, et seq. Article 9 is found at 11 M.R.S.A. § 9-101, et seq.
[33] FmHA does not agree that the body of principles controlling creation, perfection, priority and enforcement of such assignments provide the rules for decision here. It characterizes Whim Station "rents" as "accounts receivable" and contends that its rights to them must be analyzed under Maine's pre-U.C.C. accounts receivable statute. That act validated written assignments of accounts without filing or recordation. See 1954 M.R.S. c. 113, § 171, repealed by P.L.1963, c. 362, § 26.

FmHA argues that Maine's law governing assignments of leases and rents was, until adoption of the U.C.C., identical to its law of accounts receivables assignments and that repeal of that statute left some vestigial common law in place to regulate rents assignments. Grasping at straws, FmHA clutches a hollow reed. The accounts receivable act was repealed for all purposes when Maine adopted the U.C.C. The cases cited by FmHA applied the statute while it remained on the books. Not one applied it to a dispute arising from an assignment of rents. See Dole Co. v. Aetna Cas. & Sur. Co., 269 F.Supp. 72 (D.Me.1967); Crosby Milling Co. v. Sunrise Eggs, Inc., 161 Me. 245, 210 A.2d 817 (1965); Aetna Cas. & Sur. Co. v. Eastern Trust and Banking Co., 156 Me. 87, 161 A.2d 843 (1960).
Indeed, the reason why an assignment of rents was never within the accounts receivable statute is the same reason that it is not governed by the U.C.C. Assignments of rents transfer real property interests. See, e.g., In re Green Corp., 154 B.R. at 825-26; In re Rancourt, 123 B.R. at 147.
[34] In a case that did not address the parties' entitlement to rents, and in which no assignment of rents was at issue, Maine's highest court has stated: "Until the mortgagee chooses to take possession, the mortgage gives him no right to do any act whereby the mortgagor may be disturbed in his enjoyment of the estate, or its value and earnings may be diminished." Pettengill v. Turo, 159 Me. 350, 359, 193 A.2d 367 (1963). In re Somero observed that in the absence of a covenant designating the mortgagee's and mortgagor's respective rights in rents, the mortgagor would be entitled to collect rents upon taking possession or obtaining appointment of a receiver. 122 B.R. at 638.
[35] The issue generally arises in the context of proceedings to determine whether, in light of the assignment, § 552(b) and prepetition events, the assignee has a sufficient "interest" in postpetition rents to bring them within the scope of § 363(c)(2)'s restrictions on the use of cash collateral. See In re Rancourt, 123 B.R. 143, for Judge Yacos' insightful analysis of the interests and policies at play in that context. See also, e.g., In re Somero, 122 B.R. at 639-41 (discussing assignee's interest in uncollected rents, cash collateral and adequate protection); In re Park at Dash Point L.P., 121 B.R. at 855 (same). Some bankruptcy courts have held that the assignment of rents is not "perfected" if the assignee did not take steps to enforce its right to collect the rents before the petition date. Under that view, it is subject to subordination to the rights of a late-coming lien creditor or to a bankruptcy trustee exercising § 544(b) strong-arm powers. See generally McCafferty, supra n. 31 at 459-67.
[36] To resolve this case, I need not consider whether something more than a default is necessary to "activate" the assignee's rights under a rent assignment. As noted above, the minimum that any line of authority requires is default, and there had been no default, let alone a demand or an enforcement step, here.

I note that the Dorsey/FmHA mortgages and rent assignments could be read to establish by contract that more than default was required to trigger FmHA's right to rents. The mortgages state that, upon default, FmHA may obtain appointment of a receiver "with the usual powers of receivers in like cases" and may "enforce any and all other rights" under the mortgages. Given the "usual" power of a receiver to collect rents, one could argue that appointment of a receiver would be required under these loan documents. The mortgages also appear to call for post-default "enforcement" of FmHA's rights, including the right to collect rents. But, because the record discloses no default preceding Dorsey's collection of the rents at issue here, it is unnecessary to construe the terms of these mortgages and assignments.
[37] I agree with those authorities which recognize garden-variety rent assignments as assignments securing repayment obligations. See, e.g., In re Rancourt, 123 B.R. at 147; In re Park at Dash Point L.P., 121 B.R. at 856. That Maine is a "title theory" state, rather than a "lien theory" state, In re Cormier, 147 B.R. 285, 290 (Bankr.D.Me.1992); Duprey v. Eagle Lake Water & Sewer Dist., 615 A.2d 600, 602 (Me.1992), is not significant in this regard. See In re Rancourt, 123 B.R. at 147 n. 2.
[38] FmHA has not pressed the point with any vigor. However, in the interest of completeness, I treat the argument briefly.
[39] Even the tracing theory is flawed. FmHA overlooks the fact that, as a consequence of Fleet's set-off, a significant portion of the funds held under the certificates of deposit are the proceeds of FNBBH's loan, rather than collected rents.
[40] See 11 M.R.S.A. § 9-306(1) (defining "proceeds").