**UNITED STATES of America, Plaintiff,**

v.

**Daniel RICHARDS, Defendant.**

**Cr. Action No. 95–255 (HAA).**

United States District Court,
D. New Jersey.

May 8, 1996.

Office of the United States Attorney, District of New Jersey, Howard Wiener, Assistant U.S. Attorney, Newark, N.J., for U.S.

Jerome A. Ballarotto, Trenton, NJ, for defendant.

## OPINION

HAROLD A. ACKERMAN, District Judge.

This matter comes before the court on several motions by the defendant, Daniel Richards. More specifically, defendant Richards moves to dismiss various parts of the indictment on several grounds and makes several discovery requests. Prior to addressing the substance of the motions, it is helpful to briefly set forth the background of this case.

### I. Background

The Farmers Home Administration ("FmHA")[1], an agency of the United States Department of Agriculture, provides funding under the Rural Housing Program for the construction and renovation of low income rental housing units in rural areas. The defendant was a general partner in six limited partnerships that purchased rural housing projects in Pennsylvania and New Jersey under this program. Each project was required to rent apartments to low income tenants at rates below the prevailing market rates in those rural areas. In return, the FmHA subsidized the interest payments on the construction loans so that the effective rate of interest on such loans is 1%, rather than the prevailing market rate.

At the inception of each project, the defendant entered into loan agreements (one per partnership) with FmHA. Pursuant to the loan agreements, defendant's partnerships were required to establish four specific accounts for each project. The loan agreements provide that all of the accounts "shall be maintained in accordance with FmHA Regulation 7 CFR Part 1930–C." See Defendant's Memorandum in Support of Pretrial Motions Ex. A [hereinafter "Defendant's Br."]. One of these accounts was called the "reserve account." The partnerships were required to pay 1% of the total indebtedness per year into the reserve account. Furthermore, the regulation provides that "[t]he reserve account is primarily used to meet the major capital expense needs of a project," see id. Ex. F. at 108, that the prior written consent of FmHA be obtained before any disbursements can be made from reserve accounts, see id. at 111, and that "[a]ll funds received and held in any account ... shall be held in trust by the borrower for the loan obligation until used and serve as security for the FmHA loan or grant," id. at 104. Also in connection with each project, the FmHA entered into security agreements with the re-

---

1. The name of FmHA was changed several years ago to the Rural Economic and Development Agency. Because the agency was called FmHA at all times relevant to this case and because all documents refer to FmHA, I will refer to it as such.

spective partnerships. The agreements granted the FmHA "a security interest in and an assignment of its interest in the following collateral, including the proceeds thereof: A. All accounts,...." *Id.* Ex. B.

Defendant Richards admits that, in violation of the above mentioned regulation, he made periodic withdrawals from the reserve account without seeking or obtaining approval from the FmHA. As a result of this conduct, on February 9, 1995, the defendant received a "target letter" dated February 7, 1995, signed by Assistant United States Attorney, Howard Wiener, which informed the defendant that the "Inspector General of the Department of Agriculture has referred an investigative report to this office to determine whether [the defendant] should be prosecuted for various offenses, including the fraudulent conversion of property pledged to the Farmers Home Administration," and that the United States Attorney's Office would be presenting this matter to a federal grand jury. Defendant's Br. Ex. C. Upon receiving the letter, the defendant contacted Mr. Wiener and agreed to meet with him that afternoon, February 9, 1995.

Present at the meeting were the defendant, Mr. Wiener and the Department of Agriculture investigator. The defendant, who is an attorney himself but has not practiced criminal law, did not obtain an attorney for the meeting. Because the alleged fraudulent activity occurred in 1989 and early 1990, the five-year statute of limitations had already run as to the alleged fraudulent transactions that took place in 1989. Because the government was faced with the approaching expiration of the limitations period with respect to the alleged early 1990 transactions, Mr. Wiener advised Mr. Richards that the government would be presenting evidence to a federal grand jury in a matter of days. To alleviate this time pressure, the government proposed that Mr. Richards either appear before the grand jury within five days, await imminent indictment, or execute a waiver of the statute of limitations. Mr. Richards elected to waive the

statute of limitations. Mr. Wiener drafted an agreement wherein the statute was tolled for 60 days from February 13, 1995 until April 14, 1995. *See* Defendant's Br. Ex. D. Mr. Richards executed the agreement. The only specific statute mentioned in the agreement, and it appears the only specific statute discussed by the parties, was Title 18 U.S.C. § 658, which prohibits, among other things, the fraudulent conversion of property "mortgaged or pledged to" the FmHA.

Subsequently, the Office of the Federal Public Defender was appointed to represent Mr. Richards. On April 10, 1995, a second waiver was executed by the defendant, after consultation with his attorney, which tolled the limitations period from April 15, 1995 through May 15, 1995. On May 12, 1995, a third waiver was executed by the defendant, which tolled the limitations period from May 15 until May 31, 1995. Both of these waivers incorporated the first waiver by reference.

During this time period, the parties engaged in plea negotiations. In her brief, the public defender represented that she told Mr. Wiener that, in the defendant's view, § 658 was inapplicable to the facts of this case.[2] Defendant's Br. 5. After being advised of the defendant's position regarding the inapplicability of § 658, the government raised for the first time the possible applicability of Title 18 U.S.C. § 666 to the defendant's alleged conduct. *See* Defendant's Br. at 5; Government's Br. at 10. The government asserted that the same underlying facts gave rise to a violation of § 666, which prohibits, among other things, the fraudulent conversion of property, valued at more than $5,000, from an organization that receives, in any one year, benefits in excess of $10,000 from a Federal program. *See* 18. U.S.C. § 666(a)(1)(A).

The parties failed to reach a plea agreement, and on May 30, 1995, a grand jury returned a 12 count indictment. Counts 1 through 6 charged the defendant with violating §§ 666(a)(1)(A) and 2. Each count alleges a separate fraudulent conversion of funds from the reserve account of one of the defen-

---

**2.** The defendant was previously represented by the Public Defender's Office. Due to a conflict of interest, however, the Public Defender's Office

had to withdraw. Thereafter, defendant's current counsel, Mr. Ballarotto, was appointed to represent the defendant.

dant's six partnerships, and that the partnership in each count received at least $10,000 in interest credit subsidies and rental subsidies from the FmHA per year. Counts 7 through 12 charged the defendant with violating of §§ 658 and 2. The factual allegations underlying these counts correspond to counts 1 through 6. In other words, the allegedly fraudulent transaction that provides the factual basis underlying count 1, also provides the factual basis of count 7, and so on. The difference between the two sets of charges is that in counts 7 through 12 it is alleged that the money in the reserve counts was "mortgaged or pledged to" the FmHA, and not that the partnerships were organizations that received over $10,000 in benefits from a federal program in any one year.

Subsequently, on November 21, 1995, a superseding indictment was filed in this case. Counts 1 through 6 remained the same. Counts 7 through 12 in the original indictment became counts 13 through 18 in the superseding indictment. Counts 7 through 12 in the superseding indictment charge the defendant with six additional counts of violating § 666(a)(1)(A). More specifically, these counts charge that between January 1, 1990 and December 31, 1990, the defendant fraudulently converted additional moneys from the partnerships by failing to transfer money into the reserve account. There is one count per partnership.

Now before the court are defendants' motion to dismiss the indictment and motion for discovery. First, I will address the motion to dismiss, then the discovery issues.

## II. Motion to Dismiss

I will address the defendant's various grounds for dismissing various parts of the indictment in turn.

### A. Counts 1 through 6

First, defendant argues that counts 1 through 6 should be dismissed because they are brought in violation of the statute of limitations. Specifically, defendant argues that, pursuant to the parties' written waiver agreement, he waived the statute of limitations only as it applies to the § 658 charges and not as the statute of limitations applies

to charges brought pursuant to any other criminal statute.

■ The statute of limitations is not jurisdictional, but rather is an affirmative defense that may be waived, either implicitly by failing to raised it in the district court either before or at trial, *see United States v. Karlin*, 785 F.2d 90, 91–92 (3d Cir.1986), *cert. denied*, 480 U.S. 907, 107 S.Ct. 1351, 94 L.Ed.2d 522 (1987), or explicitly through a written waiver agreement that is knowingly and voluntarily entered into with the government, *see United States v. Spector*, 55 F.3d 22, 24 (1st Cir.1995) (citing *United States v. Wild*, 551 F.2d 418, 422–24 (D.C.Cir.), *cert. denied*, 431 U.S. 916, 97 S.Ct. 2178, 53 L.Ed.2d 226 (1977)). In this case, defendant Richards does not dispute that he knowingly and voluntarily entered into the waiver agreement. The dispute is whether or not the defendant only waived the limitations period as it related to violations of a specific statute (i.e., § 658) or whether he waived it as to his alleged underlying conduct which would give rise to violations of both §§ 658 and 666. Therefore, the issue is one of interpreting the waiver agreement.

■ Like plea agreements, a waiver of the statute of limitations is a pretrial agreement between the state and defendant. *United States v. Levine*, 658 F.2d 113, 124 (3d Cir. 1981). Therefore, because plea bargains are governed by the law of contracts, *see United States v. Bogusz*, 43 F.3d 82, 94 (3d Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1812, 131 L.Ed.2d 736 (1995), I will apply the same principles to the waiver agreement in this case, *see Spector*, 55 F.3d at 25 ("assuming" that principles of contract law are useful in analyzing agreements to waive the statute of limitations).

■ Furthermore, "[c]ourts should consider not only contract principles but also ensure that the ... bargaining process is attended by safeguards to insure the defendant [receives] what is reasonably due in the circumstances." *United States v. Moscahlaidis*, 868 F.2d 1357, 1361 (3d Cir.1989) (quotation omitted). Therefore, although "the parties must strictly adhere to their promises" *see Bogusz*, 43 F.3d at 94 (citing

*United States v. Badaracco,* 954 F.2d 928, 939 (3d Cir.1992)), "the government cannot resort to a rigidly literal approach in the construction of language." *Moscahlaidis,* 868 F.2d at 1361 (citation omitted). Rather,

> [i]n determining whether the terms of an ... agreement have been violated, [the] court must determine whether the government's conduct is inconsistent with *what was reasonably understood by the defendant when entering [the agreement]*.

*Badaracco,* 954 F.2d at 939 (quotation omitted) (emphasis added).

Thus, the question is what did the defendant reasonably understand the agreement to mean when he entered it. In answering this question, the language of the waiver agreement must be analyzed.

■ Paragraph 2 of the agreement describes the factual allegations underlying the offenses. *See* Defendant's Br. Ex. D at ¶ 2. It describes the fraudulent conversion of the reserve accounts, and also alleges that the FmHA had a security interest in the reserve accounts. The latter is the jurisdictional element of a § 658 offense. No where is there a factual allegation in the agreement that the partnerships received benefits from a federal program of greater than $10,000, i.e., there is no mention of the jurisdictional element of a § 666 offense.

However, paragraph 3 states that the conduct described in paragraph 2 "will in all likelihood result in [Richards'] indictment for, *among other things,* fraudulent conversion of property pledged to FmHA, pursuant to Title 18 United States Code, Section 658." *Id.* (emphasis added). Thus, this paragraph seems to indicate that the defendant was on notice that his alleged conduct may give rise to charges under statutes other than § 658.

On the other hand, paragraph 5 provides that Richards was informed "that under federal law (18 U.S.C. section 3282) there is a five year statute of limitations for the fraudulent conversion offenses (18 U.S.C. § 658) [he] allegedly committed, all of which are described in more detail in paragraph 2 above." *Id.* This paragraph arguably supports the defendant's position that the parties were only talking about § 658.

However, the following two portions of the agreement, when combined with paragraph 3, lead me to conclude the defendant's "reasonable understanding" of the agreement, *see Badaracco,* 954 F.2d at 939, at the time he signed it was that he was waiving the statute of limitations as it applied to all criminal charges, regardless of the specific statute, that may arise from his alleged conduct, i.e., the alleged fraudulent conversion of the reserve accounts in February and March of 1990. First, in paragraph 7, the agreement states that Richards

> believe[s] that it is in [his] interest to waive the statute of limitations *for all the unauthorized withdrawals* in February and March 1990 for which the statute of limitations has not yet run.

*Id.* at ¶ 7 (emphasis added). In paragraph 9, the agreement provides that

> I, DANIEL D. RICHARDS, *do voluntarily waive the federal statute of limitations* as it applies to the possible fraudulent conversion charges for the unauthorized withdrawals from the reserve accounts during February and March 1990 ..., as set forth and described above....

*Id.* at ¶ 9 (emphasis in original).

These two portions of the agreement only refer to the alleged acts of fraudulent conversion and not to a specific statute. Therefore, when combined with paragraph 3, which put the defendant on notice that his alleged conduct might result in him being indicted under statutes in addition to § 658, these portions of the agreement indicate that the defendant reasonably understood the agreement to have constituted a waiver of the statute of limitations for all criminal violations arising from the alleged fraudulent conversions, and not that the waiver constituted a waiver only as to violations of a specific statute—§ 658.

Furthermore, this reading of the agreement does not undermine the purpose of the statute of limitations.

> Limitations statutes ... are intended to foreclose the potential for inaccuracy and unfairness that stale evidence and dull memories may occasion in an unduly delayed trial. They provide relief from extended pretrial anxieties and, by

encouraging investigation of recent crimes, contribute to a rational allocation of prosecutorial resources.... [I]t is primarily concerns of prosecutorial promptness ... that underlie limitations statutes.

*Levine,* 658 F.2d at 127. In this case, the government has fulfilled "the statutory policy of encouraging prompt investigation." *See id.* at 128. The government was prepared to indict the defendant within the limitations period for his alleged fraudulent conversion of the reserve accounts. In addition, there is no evidence or allegation that "the defendant [is] handicapped in mounting his defense on account of a lapse of time or destruction of evidence." *See id.* at 129. In fact, the defendant does not dispute that he waived the statute as it relates to the § 658 offense. However, the factual allegations underlying the § 666 charges contained in counts 1–6 are the same factual allegations underlying § 658—the only difference is the statutes have two different jurisdictional elements. Because the same facts underlie the § 658 counts and because the defendant does not dispute that the statute was waived with respect to those counts, he cannot claim that he is handicapped in mounting a defense against the § 666 counts contained in counts 1–6. Therefore, the conclusion that the waiver agreement applies to the defendant's conduct and not only to charges specifically brought pursuant to § 658 does not undermine the purposes of the statute of limitations.

For these reasons, the defendant's motion to dismiss counts 1–6 on the basis of the statute of limitations is denied.

### B. Counts 7 through 12

Next, the defendant argues that the portions of the superseding indictment that did not appear in the original indictment must be dismissed as violative of the statute of limitations. Specifically, defendant argues that the superseding indictment made substantial changes to the charging language contained in paragraphs 5, 6, 9, and 10 of the original indictment and adds new charges in counts 7 through 12 of the superseding indictment. The additional charging language adds factual allegations that underlie the new charges, and thus, for the purposes of the following analysis it is sufficient to merely discuss the propriety of the new charges.

The superseding indictment was filed in November 21, 1995, which is after the tolling period in the last waiver of the statute of limitations expired. The Court of Appeals has recently stated that

[w]here, ..., the government has filed a superseding indictment, the day on which the original indictment was filed controls for statute of limitations purposes, provided that, ..., the superseding indictment *does not materially broaden or substantially amend* the charges in the first.

*United States v. Oliva,* 46 F.3d 320, 324 (3d Cir.1995) (emphasis added) (citing *United States v. Friedman,* 649 F.2d 199, 203–04 (3d Cir.1981) (adopting *United States v. Grady,* 544 F.2d 598, 601–02 (2d Cir.1976))). In this case, the addition of counts 7 through 12 in the superseding indictment clearly expand the charges brought against the defendant. *See, e.g., Friedman,* 649 F.2d at 203–04 (holding that the indictment was not materially broadened where, "although additional underlying details have been alleged," the facts alleged were not changed, but rather five counts were consolidated into one); *United States v. O'Neill,* 463 F.Supp. 1205 (E.D.Pa.1979) (in case where defendant was charged with knowingly making a material false statement for the purpose of obtaining a loan, court held that charges were materially broadened where the superseding indictment alleged that the defendant made a different misrepresentation to the bank than was alleged in the first indictment).

However, this does not end the matter. Counts 7 through 12 all allege that the defendant committed the alleged acts between January 1, 1990 and December 31, 1990. The superseding indictment was filed on November 21, 1995. There is a five year statute of limitations for violations of § 666. *See* 18 U.S.C. § 3282. Therefore, it appears that the indictment alleges a continuing violation, and that therefore, the indictment may not have been filed outside the limitations period. This determination, however, cannot be made until the evidence is presented at trial. *See*

*Levine,* 658 F.2d at 121 ("Because the exact dates of continuing violations, conspiracies, or statutory tolling justified by flight from jurisdiction, can often be properly evaluated only after development of the evidence at trial enables an accurate assessment of timeliness, denials of motions to dismiss based on statute of limitations claims do not unequivocally fit within the category of orders that are formally and completely rejected before trial."). Therefore, defendant's motion to dismiss counts 7 through 12 are dismissed at this time.

### C. Counts 1 through 12—All of the § 666 Counts

■ Next, defendant moves to dismiss all 12 of the § 666 counts on the ground that the government cannot prove that any of the subject organizations, i.e., the defendant's six partnerships, received more that $10,000 in benefits from the government as required by § 666(b). Defendant is accused of violating § 666(a)(1)(A), which provides, in part, that

(a) Whoever, *if the circumstances described in subsection (b) of this section exists—*

(1) being an agent of an organization, . . .—

(A) embezzles, steals, obtains by fraud, or otherwise without authority knowingly converts to the use of any person other than the rightful owner or intentionally misapplies, property that—

(i) is valued at $5,000 or more, and

(ii) is owned by, or under the care, custody, or control of such organization, government, or agency. . . .

18 U.S.C. § 666(a)(1)(A) (emphasis added). Section 666(b) provides, in part, that

[t]he circumstances referred to in subsection (a) of this section is that the organization . . . receives, in any one year period, *benefits in excess of $10,000* under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of federal assistance.

18 U.S.C. § 666(b) (emphasis added).

Both the original and superseding indictments allege that

During each year of the mortgage, each Limited Partnership received interest credit subsidies and rental subsidies from FmHA well in excess of $10,000 per year. Accordingly, at all relevant times, the Limited Partnerships were organizations that received in any one year period benefits in excess of $10,000 under a federal program. . . .

*See* Original Indictment at ¶ 4; Superseding Indictment at ¶ 4. It should be noted that although the defendant is not specifically accused of fraudulently converting the interest rate subsidies (but rather is accused on converting the reserve accounts), that is irrelevant to whether he violated § 666. This is because the statute only requires that the defendant convert property that is owned by, or under the care of, an organization that happens to have received greater than $10,000 in benefits under a federal program in any one year. The statute does not require that the specific benefit received under the federal program be the property that was wrongfully converted by the defendant.

■ The defendant argues that these interest rate subsidies were not a "benefit" to the partnerships, but rather were a *quid pro quo* for certain obligations of the partnership.

More specifically, the defendant asserts that in each case, after the project was built, the Government and the project director agreed on a "market rental rate" for each property. This is the maximum rate at which each unit in that project can be rented. The parties also agreed on a minimum rental rate, called the "basic rental rate." If any unit in the project is rented at the basic rental rate, or at some rate in between the basic and market rates, then the partnership would receive a subsidy to reduce the effective interest rate on the construction loan below the market rate. If, on the other hand, all of the units in the project were rented at the market rental rate, then the partnership would not receive a subsidy, and would pay the full interest on the loan as agreed to in the loan documents. *See* Defendant's Supplemental Br. at 8–9.

Thus, in exchange for the construction loan, the partnership agreed to rent the units at no more than the agreed upon market

rental rate. In addition, the partnership also agreed to a cap of 8% on the return it can earn on its initial investment. If the partnership's return on investment for any year exceeds 8%, then "the Government may require that the borrower reduce rents the following year and/or refund the excess return on investment to the tenants or use said excess in a manner that will benefit the tenants." *See* Defendant's Supp. Br. Ex. 2. Therefore, according to the defendant,

> the project agrees that it will make no more than 8% in each year of its cash investment and further agrees to rent the units for no more than the "market rental rate." In exchange the Government agrees that whenever the project cannot rent all the units for the "market rental rate" and is forced to rent the units at the "basic rental rate" or somewhere in between, the Government will subsidize the interest paid on the initial construction loan for each project. Clearly a *quid pro quo.*

*Id.* at 10. Thus, the defendant argues that only the tenants of the projects "benefit" from the federal program, and the partnerships are merely engaged in a *quid pro quo.*

In support of his argument, the defendant relies in part on *United States v. Stewart,* 727 F.Supp. 1068 (N.D.Tex.1989). In *Stewart,* the court stated that "Congress did not intend the statute to apply in a situation of *quid pro quo." Stewart,* 727 F.Supp. at 1072. However, the court based this conclusion on the legislative history that provides, in part, that

> if a government agency lawfully purchases more than $10,000.00 of equipment from a supplier, it is not the intent of this section to make a theft of $5,000.00 or more from the supplier a Federal Crime.

*Id.* (quoting S.Rep. No. 225, 98th Cong., 2d Sess. 370, reprinted in 1984 U.S.Code Cong. & Admin.News 3182, 3511). The court further concluded that Congress intended for the statute to apply to programs that

> involve a charitable distribution of funds; that is, the federal government distributing funds for the purpose of aiding the needy, and receiving no material return for its funds.

*Stewart,* 727 F.Supp. at 1071. In other words, "the statute was not intended to apply to purely commercial transactions." *Id.* at 1072. Based on this, the court found that a supplier of helicopter parts to the government was not an organization that was covered by § 666.

Although the *Stewart* court stated that § 666 is not intended to apply to a *quid pro quo,* its analysis is consistent with that of the Second Circuit in *United States v. Rooney,* 986 F.2d 31 (2d Cir.1993). In *Rooney,* the court stated that

> [t]he inquiry is not whether there is a *quid pro quo,* but, rather, whether the funds disbursed can be considered Federal assistance within a specific statutory scheme intended to promote public policy objectives and not payments by the government as a commercial entity.

*Rooney,* 986 F.2d at 35. Thus, despite the two courts' conflicting use of the term *"quid pro quo",* both courts held that § 666 does not apply to organizations involved in purely commercial transactions with the government.

Therefore, pursuant to these two cases, the partnerships at issue in this case are the type of organizations that come within the ambit of § 666(b)—assuming that the government proves that they received more than $10,000 in benefits. The FmHA is not dealing with the partnerships merely as a commercial entity, but rather is dealing with the partnerships within a specific statutory scheme intended to promote the public policy objectives of providing low income housing in rural areas.

The two other cases relied upon by the defendant do not detract from this conclusion. First, the defendant relies on *United States v. Wyncoop,* 11 F.3d 119 (9th Cir. 1993). This case is clearly distinguishable. In *Wyncoop,* the Ninth Circuit held that § 666 "was not intended to cover thefts from institutions like Trend College that do not themselves receive and administer federal funds." *Id.* at 122. In the case now before the court, the partnerships directly received federal funds, i.e., the interest rate subsidies. Therefore, pursuant to *Wyncoop,* if the gov-

ernment is able to demonstrate that such credits were greater than $10,000 during the relevant time period, then section 666(b) would be satisfied.

Lastly, the defendant relies on *United States v. Webb*, 691 F.Supp. 1164 (N.D.Ill. 1988). In *Webb*, the court held that funds paid by the Department of Housing and Urban Development ("HUD") to a private accounting firm to manage and administer a Federal program were not § 666(b) benefits. Rather, the funds were "monies paid in consideration for its services." *Id.* at 1169. Although, in *Rooney*, the Second Circuit stated that it "express[es] no opinion as to what the result in *Webb* should have been," the court did note that the holding in *Webb* was in conflict with the legislative history. *Rooney*, 986 F.2d at 35. I agree, and therefore find *Webb* to be unpersuasive.

For these reasons, defendant's motion to dismiss counts 1 through 12 on the grounds that the government cannot prove that any of the defendant's six partnerships received more that $10,000 in benefits from the government as required by § 666(b) is denied.

### D. Counts 13 through 18—Section 658

Next, the defendant argues that counts 13 through 18 of the superseding indictment should be dismissed because § 658 does not apply to defendant Richard's alleged conduct and, in the alternative, the terms "mortgaged or pledged to" in § 658 are unconstitutionally vague.

#### 1. "Mortgaged or Pledged to"

Section 658 provides, in part, that

[w]hoever, with intent to defraud, knowingly conceals, removes, disposes of, or converts to his own use ..., any property mortgaged or pledged to ... the Secretary of Agriculture acting through the Farmers Home Administration shall [have committed an offense against the United States].

18 U.S.C. § 658. The defendant argues that the government will be unable to establish that the reserve accounts were "mortgaged or pledged to" the FmHA because, among other reasons, the government cannot demonstrate that the FmHA had a perfected security interest in the account pursuant to

Article 9 of the Uniform Commercial Code ("Article 9") or common law. Defendant's Br. at 15. This is because Article 9 by its own terms does not apply to deposit accounts, and to perfect such a security interest at common law the FmHA would have had to take physical possession of the property or exercise control over it. *Id.*

Thus, the issue with respect to this aspect of the defendant's motion is what is the meaning of "mortgaged or pledged to" in § 658.

The Seventh Circuit addressed this issue in *United States v. Berman*, 21 F.3d 753 (7th Cir.1994). In that case, D.C. Equipment Inc. obtained a secured loan from Peshtigo National Bank ("PNB"). The FmHA guaranteed 90% of the loan. PNB sold the guaranteed portion of the loan to Merrill Lynch, which in turn resold it to Bradford Government Loan Services ("Bradford"). Thereafter, D.C. Equipment defaulted, and Bradford invoked the FmHA's guaranty. The FmHA paid off Bradford in exchange for obtaining Bradford's interest in the loan. D.C. Equipment then filed for bankruptcy and was authorized to auction off its surplus inventory. The defendants conducted the auction and siphoned off $500,000 in the proceeds. As a result, the FmHA was unable to obtain reimbursement out of the proceeds of the auction for the money it had paid Bradford under the guaranty. *See id.* at 755.

Among other issues, the Seventh Circuit had to determine whether the proceeds of the auction could be considered to have been "pledged to" the FmHA (the indictment only charged that the proceeds were pledged to and not mortgaged to the FmHA).

The court first noted that to have a literal pledge, the FmHA was required to have a possessory interest in the assets of D.C. Equipment, which it did not. *Id.* at 756. However, "[t]he statutory phrase 'mortgaged or pledged to' is a clumsily archaic way of identifying *all security interests* held by the federal agencies that the statute seeks to protect." *Id.* (citing *United States v. Archambault*, 767 F.2d 402 (8th Cir.1985)) (emphasis added). Although neither "mort-

gaged" nor "pledged" is defined in the statute,

> the intent to embrace all security interests can reasonably be inferred when we recall that the statute dates from the 1930s, when the terms "mortgage" and "chattel mortgage," which have since been superseded by "security interest," UCC 9–102(2), were used interchangeably to refer to nonpossessory security interests in personal property, and when the verb "mortgage" (the statute uses the verb, not the noun) was commonly used to refer the granting of any such interest.

*Id.* (citation omitted). In addition, " 'pledge,' like 'mortgage,' has long been used loosely as well as tightly, to cover security interests in personal property that . . . are not possessory interests." *Id.* (citations omitted). Thus, the Seventh Circuit concluded that it was

> fairly clear that the draftsman of the original section 658 (the Farm Credit Act [of 1933]) meant the term to be used broadly, that the average person who troubled to read the statute would interpret it broadly, and that defendants therefore committed an offense within the scope of the indictment—provided the FmHA actually had a security interest in the proceeds of the auction.

*Id.* at 757.

In *United States v. Archambault,* 767 F.2d 402 (8th Cir.1985), the Eight Circuit stated that, because the terms "mortgaged or pledged to" are not defined in the statue, "the natural and commonly understood meaning [should] be given to words used in [the] statute unless it is . . . clear . . . that a different meaning was intended." *Id.* at 404 (quotation omitted). Without further discussion, the court held that the language of § 658 was clear and the relevant phrase "includes any property in which the [FmHA] has a chattel mortgage, lien, or security interest." *Id.*

■ Significantly, neither court held that the § 658 requires the FmHA to have a *perfected* security interest in the property, whether perfected pursuant to common law or Article 9. Furthermore, the purpose of the statute is "to protect the collateral given the Farmers Home Administration from conscious fraud." *Archambault,* 767 F.2d at 404 (quotation omitted). I can think of no reason as to how this purpose would be furthered by applying the statute to property in which the FmHA has a perfected security interest, but not to property in which the FmHA has an unperfected security interest. Therefore, defendant's arguments that the government will be unable to prove that the requirements of § 658 have been met because FmHA could not have had perfected security interest are not persuasive.

■ In this case, the government represents that Richards, as general partner of each limited partnership, signed security agreements for each project. One of the agreements, which is attached as Exhibit B to defendant's brief and is, according to the Government, substantially similar to the agreements signed by all six partnerships, granted the FmHA "a security interest in and an assignment of its interest in the following collateral, including the proceeds thereof: A. All accounts, . . . ." Defendant's Br. Ex. B. Thus, it appears that the FmHA had a security interest in the reserve accounts and that the defendant's conduct is covered by the statute.

Lastly, defendant's reliance on *In re Dorsey,* 155 B.R. 263 (Bankr.D.Me.1993) is misplaced for two reasons. First, in *Dorsey,* the court addressed whether the FmHA's rights in the reserve accounts were superior to that of a competing creditor. *See id.* at 264. In addition, the security agreement in *Dorsey* is distinguishable. Unlike the security agreement in this case, in *Dorsey* the security agreement did not give the FmHA a security interest in "all accounts." *See id.*

Therefore, for these reasons, defendant's motion to dismiss to indictment on this ground is denied.

### 2. *Void for Vagueness*

■ Defendant also argues that the § 658 counts must be dismissed because the terms "mortgaged or pledged to" are unconstitutionally vague.

The void-for-vagueness doctrine requires that a penal statute define the criminal

offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.

*Posters 'N' Things, Ltd. v. United States,* —— U.S. ——, ——, 114 S.Ct. 1747, 1754, 128 L.Ed.2d 539 (1994) (quotation omitted). In other words, a criminal statute does not satisfy due process notice requirements if it "fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden." *United States v. Batchelder,* 442 U.S. 114, 123, 99 S.Ct. 2198, 2203, 60 L.Ed.2d 755 (1979). Furthermore, the void-for-vagueness doctrine "requires the person raising it to show that he himself has been injured by the overly broad language." *San Filippo v. Bongiovanni,* 961 F.2d 1125, 1135 n. 14 (3d Cir.) (citation omitted), *cert. denied,* 506 U.S. 908, 113 S.Ct. 305, 121 L.Ed.2d 228 (1992).

■ "[T]he average person who troubled to read the statute [i.e., § 658] would interpret it broadly" to include all security interests. *See Berman,* 21 F.3d at 757. In this case, the defendant is alleged to have signed security agreements that gave "all accounts", among other things, to the FmHA as collateral for the loan. Therefore, Richard's cannot claim that he himself has been injured by the overly broad language. *San Filippo,* 961 F.2d at 1135 n. 14. In addition, the security agreement that the defendant signed explicitly states that the "Secured Party [i.e., the FmHA] has informed Debtor [i.e., Richards] that disposal of property covered by this security agreement with out the consent of Secured Party ... may constitute a violation of federal criminal law." Defendant's Br. Ex. B, Section IV.J. Therefore, the defendant was on notice that conversion of the reserve accounts, which were covered by the security agreement, may be violative of federal law. For these reasons, defendant's motion to dismiss on void-for-vagueness grounds is denied.

### III. Discovery

#### A. Rule 16

■ Defendant moves, pursuant to Federal Rule of Criminal Procedure 16, for an order directing the government to disclose all records pertaining to any cases in which the unauthorized withdrawals from a reserve account have been prosecuted under § 658 or any other criminal statute. Because there are no reported cases in which an unauthorized withdrawal from a reserve account has been prosecuted under § 658 and given the legal questions that the court just discussed, defendant argues that he is entitled to this information in order to discover whether he has been selectively prosecuted.

Rule 16 does not provide for the discovery of this information. Furthermore, the defendant has cited no other rule, statute, or judicial opinion to support this request. Because there appears to be no legal basis for the request, I am denying defendant's motion.

#### B. Grand Jury Transcripts

Defendant moves, pursuant to Federal Rule of Criminal Procedure 6(e)(3)(c)(ii) for disclosure of the grand jury transcripts. Defendant argues that because the reserve accounts cannot be construed as having been "mortgaged or pledged" to the FmHA, he is entitled to know what the grand jury was instructed regarding the definition of "mortgaged or pledged to."

■ Grand jury proceedings must remain secret except when there is a compelling necessity to disclose. *United States v. Procter & Gamble Co.,* 356 U.S. 677, 682, 78 S.Ct. 983, 986, 2 L.Ed.2d 1077 (1958). This policy of secrecy in connection with grand jury proceedings is well established in the federal judicial system, and has been codified in Rule 6(e) of the Federal Rules of Criminal Procedure. The rule provides for an exception only "upon a showing that grounds may exist for a motion to dismiss the indictment because of matters occurring before the grand jury." Fed.R.Crim.P. 6(e)(3)(C)(ii).

■ Because of the strong public interest in maintaining the privacy of grand jury proceedings, the burden on the moving party is high. The Supreme Court has interpreted Rule 6(e) to allow for disclosure only after a showing of a "particularized need" which outweighs the public interest in secrecy. *Den-*

*nis v. United States,* 384 U.S. 855, 869, 86 S.Ct. 1840, 1848, 16 L.Ed.2d 973 (1966); *Procter & Gamble Co.* 356 U.S. at 683, 78 S.Ct. at 987. To satisfy the "particularized need" standard, the moving parties have the burden of showing "that the material they seek is needed to avoid a possible injustice in another judicial proceeding, that the need for disclosure is greater than the need for secrecy, and that their request is structured to cover only the material so needed." *Douglas Oil Co. v. Petrol Stops Northwest,* 441 U.S. 211, 222, 99 S.Ct. 1667, 1674, 60 L.Ed.2d 156 (1979). Moreover, once such a need is shown, the district court "must weigh the competing interests and order [only] so much disclosure as needed for the ends of justice." *In re Grand Jury Matter (Catania),* 682 F.2d 61, 62 (3d Cir.1982).

■ In this case, because I have ruled that § 658 does potentially apply to the reserve accounts, the defendant has not demonstrated a particularized need that outweighs the public interest in secrecy. Therefore, defendant's motion is denied.

### C. *Rule 404(b)*

Next, the defendant moves for disclosure of evidence the government plans to offer pursuant to Federal Rule of Evidence 404(b). This motion is moot because the government has disclosed the nature of the Rule 404(b) evidence it plans to introduce at trial in its brief.

### IV. *Conclusion*

For the reasons detailed above, defendant's motion to dismiss the indictment is denied, with one exception. The exception is that defendant's motion to dismiss counts 7 through 12 of the superseding indictment on the basis of the statute of limitations is dismissed as premature. In addition, defendant's motions for discovery pursuant to Federal Rule of Criminal Procedure 16 and for disclosure of grand jury transcripts are denied. Lastly, defendant's motion for disclosure of evidence the government plans to offer pursuant to Federal Rule of Evidence 404(b) is dismissed because it is moot.